[S. F. No. 6226.  In Bank.—January 30, 1915.]

## WISE REALTY COMPANY et al., Appellants, v. ASHBY O. STEWART et al., Respondents.

SALE BY ONE BUSINESS ASSOCIATE TO ANOTHER—BONA FIDES—FINDINGS. In an action involving the question of the *bona fides* of the purchase by an associate in a business venture of the interest of one of his co-associates in certain corporations which had been adopted by them as instrumentalities through which to carry out the venture, it is held that the finding that the sale was *bona fide* and authorized by the seller is supported by the evidence.

ID.—CORPORATIONS AS INSTRUMENTALITIES OF ASSOCIATES—IRREGULARITIES IN CORPORATE PROCEEDINGS.—Equity will look through form to

substance, and if the transactions between the associates themselves were fair, and no rights of independent and nonparticipating stockholders are involved, their validity is not affected by mere irregularities in the corporate proceedings resorted to in the endeavor to give them effect.

APPEAL from a judgment of the Superior Court of the City and County of San Francisco and from an order refusing a new trial.   J. M. Seawell, Judge.

The facts are stated in the opinion of the court.

Metson, Drew & Mackenzie, and Albert Fink, for Appellants.

W. G. Deal, and W. E. F. Deal, for Respondent Ashby O. Stewart.

Wright, Wright & Stetson, and J. F. Bowie, for other Respondents.

HENSHAW, J.—The Wise Realty Company, plaintiff, was the owner of certain stock of the Lincoln Realty Company.   J. T. Sullivan, and Jafet Lindeberg, plaintiffs, assert a one-third interest in the stock of the Wise Realty Company, and consequently, in the stock of the Lincoln Realty Company owned by the Wise Realty Company.   Defendant Ashby O. Stewart, under claim and color of title to this stock of the Lincoln Realty Company so owned by the Wise Realty Company, sold and conveyed it to his codefendants Kohlberg and others.   This action is brought by plaintiffs to have these defendants declared trustees of this stock for the corporation and in the event that it should be held that Stewart's fellow defendants are innocent purchasers, then to hold Stewart as involuntary trustee for the proceeds of the sale.   This brief statement will aid in the marshalling of the facts, which are somewhat complicated, in their proper relations to the questions involved.

In February, 1908, the board of education of the city and county of San Francisco advertised for bids for the rental of a lot situated at Fifth and Market streets and known as the Lincoln School property.   The call for bids required that each bid be accompanied by a certified check for ten thousand dollars payable to the order of the board.   Upon the award

the successful bidder was to give a good and sufficient undertaking in the penal sum of twenty-five thousand dollars conditioned upon the faithful performance of the terms and covenants of the lease to be executed. Defendant Stewart possessed moderate means but much energy. He was worth about ten thousand dollars. He was deeply interested in securing the lease of the property. He could not engage in so large an undertaking alone. He enlisted Maurice Rosenthal as a partner or coventurer. Rosenthal, a man of wealth and of knowledge of real estate values in San Francisco, had organized the Wise Realty Company, all the stock of which (though most of it stood in the name of a trustee) was issued to and owned by him. Rosenthal agreed with Stewart to join him upon equal terms and it was further agreed that for convenience the bid should be submitted in the name of the Wise Realty Company. This was done and the Wise Realty Company proved to be the successful bidder. After this and between the first and fifth day of May, 1908, and before the execution of the lease, plaintiff Sullivan became interested in the venture. Sullivan did not know Stewart but was a friend of Rosenthal, and under Rosenthal's representations and with the assent of Stewart, all under the belief that Sullivan was a man of large financial resources and could and would aid in carrying out the enterprise, the half interests of Stewart and Rosenthal were divided, Sullivan coming in for a one-third interest and paying therefor one-third of the amount of the certified check for ten thousand dollars which had been deposited by Rosenthal and Stewart with the bid of the Wise Realty Company. Sullivan, in turn, sold one-half of his one-third interest to Jafet Lindeberg with the understanding between them that Lindeberg should not be expected to devote any of his personal time or attention to the matter but that Sullivan should look out for, represent, and manage Lindeberg's interest as well as his own. Over this there is no dispute, and Lindeberg may, therefore, be eliminated upon the understanding that whatever is said touching the Sullivan interest, for the reasons indicated, applies to the Lindeberg interest as well.

The lease, to the execution of which by the board of education, the Wise Realty Company as successful bidder had acquired a right, covered a term of thirty-five years with a rental of $3780 per month, payable in advance, for the first

five years, and $7245 per month for the remaining thirty years, or a total rental of $2,836,000. In addition, the lessee was to covenant to pay all taxes and erect a four-story building upon the property within eighteen months from the date of the execution of the lease and to keep the building insured for at least one hundred thousand dollars, giving, as has been indicated, an approved undertaking in the sum of twenty-five thousand dollars conditioned upon the lessee's due performance of these terms and covenants. The Wise Realty Company at that time owned no property other than the right to this lease. The beneficial ownership of all of its stock was, and was understood to be, one-third each in Stewart, Rosenthal, and Sullivan. They believed it desirable to organize another corporation with a much larger capitalization and, therefore, with a much larger bonding capacity, to manage their undertaking. Therefore, they organized the Lincoln Realty Company. It was understood between the three principals that the lease should be executed to and by the Wise Realty Company and by it transferred to the Lincoln Realty Company in consideration of the delivery by the Lincoln Realty Company to the Wise Realty Company of a certain amount of the stock of the Lincoln Realty Company. On May 28th, before the execution of the lease to the Wise Realty Company, Sullivan left for Alaska after depositing with his friend Rosenthal sufficient securities to cover his one-third proportion of the twenty-five thousand dollar bond which was to accompany the lease.

Following the departure of Sullivan, the associates who remained in San Francisco, and particularly Stewart, were active in the matter of their venture. They sought various modifications of the lease submitted to them for their acceptance, and, in particular, a modification substituting five thousand dollars cash for the twenty-five thousand dollar bond. They interviewed financial men and institutions to secure money for their enterprise by the sale of bonds of the Lincoln Realty Company and by other methods. They sought to engage tenants and to secure from them advance payments of rent. They interviewed contractors to learn how much or how little of their payments for the erection of the building these contractors would take in bonds of their Realty Company. They wired Sullivan in Alaska asking him to advance seventy-five thousand dollars ''as he had

agreed," and again asking him if he could secure "another partner" to whom they would make over a one-sixth interest upon his advancement of seventy-five thousand dollars. The replies were disappointing. Sullivan could or would advance no money and could find no "other partner." Meantime the board of education, through its secretary, was urging and demanding the execution of the lease, and threatening to forfeit the ten thousand dollars deposited by certified check for their failure so to do. On June 27th the secretary, in response to their inquiries whether a cash deposit of five thousand dollars could be substituted in lieu of the twenty-five thousand dollar bond, replied that he did not see how the terms could be modified. "In my estimation the board would not be willing to consider the matter of a cash bond of smaller amount which would serve in lieu of the proposed surety bond." Rosenthal became alarmed and was anxious to be quit of what he had come to regard as a bad and dangerous venture. Upon Sullivan's failure or refusal to advance funds further telegraphic correspondence was opened with him by his San Francisco associates. They first wired him to the effect that they could sell out all of their rights for twenty-five thousand dollars and would he accept. They followed this by another telegram on June 24th in this language: "Party reduces offer to ten thousand. Are you still willing to invest seventy-five to end this thing if we can get time on balance or shall we sell? Wire." Upon the same day they followed this dispatch with the following: "Party refuses to buy at any price. Will forfeit deposit unless you come through as agreed with seventy-five thousand. Wire." The refusal of Sullivan to advance money, the attitude of the board of education in demanding the twenty-five thousand dollar surety bond, the inability of the associates up to that time successfully to finance their venture, the payments of the monthly rent which were inevitably to be made if the lease was once entered into and the liability to loss, all worked to determine Rosenthal to draw out of the venture. Stewart, still sanguine and of less financial responsibility, was willing to go ahead and "take a chance." Rosenthal thereupon agreed with Stewart to sell to the latter his and Sullivan's interest for one thousand dollars, and to wait for the remainder of the three thousand three hundred and thirty-three dollars which each had put into the venture upon what

was regarded as the remote contingency that Stewart might meet with success in the enterprise and be able out of its proceeds thus further to reimburse them. On July 1, 1908, therefore, the following telegram signed by Rosenthal and Stewart was sent to Sullivan in Alaska: "Cannot make bond. Board will forfeit deposit to-day. Stewart offers to pay one month's rent, take all our rights, and try to save all or part of our deposit; shall we accept? Answer immediately." No reply came to this until July 6th, when Sullivan wired as follows to Rosenthal personally: "Accept any proposition that has any of our money." The telegram to Sullivan of July 1st was in all essentials true. They could not give the bond because Rosenthal would not do it, and without Rosenthal, Stewart was helpless. The board had declared its intention to forfeit the deposit. Later in the day, however, the board notified the Wise Realty Company that it agreed to a modification of the conditions of the lease as requested,—namely, it would accept a five thousand dollar cash deposit in lieu of the twenty-five thousand dollar undertaking. Sullivan in Alaska was not notified of this change in the situation and upon the failure of his associates so to notify him fraud is predicated. This fraud, however, is charged against Stewart and not against Rosenthal. Yet it is to be remembered that while the legal obligations of fair play and disclosure were imposed upon all three of the associates by virtue of their relationship, yet that the personal obligations of friendship and fidelity existed between Sullivan and Rosenthal and not between Sullivan and Stewart. Sullivan and Rosenthal were trusted friends. Sullivan and Stewart were mere acquaintances engaged for purposes of profit in this single venture. Moreover, it is to be remembered that it is to his friend Rosenthal and not to the two associates who had signed the telegram to him of July 1st that Sullivan makes reply. In that reply he authorizes Rosenthal to accept any proposition that will return to him any of the money he has invested.

It here becomes necessary to digress for a moment and review the story of these transactions as they were carried out through the instrumentality of the corporations, the equitable ownership of the stock in both of which, as has been pointed out, was in the three associates, the corporations themselves being but convenient mediums for the transac-

tions of their business. The Wise Realty Company execu-
ted the lease and in turn assigned it to the Lincoln Realty
Company with its right to the ten thousand dollar deposit.
Three shares of the Lincoln Realty Company had been issued
standing in the names, one share to each, of the three asso-
ciates. The Lincoln Realty Company in consideration of the
assignment to it by the Wise Realty Company of the lease,
undertook to fulfill all its terms and covenants and to release
the Wise Realty Company from all responsibility and liabil-
ity under the lease, and further to deliver to the Wise Realty
Company one thousand shares of the Lincoln Realty Com-
pany's stock.

All this was done. Nominally by the corporations, in fact,
however, by Stewart, to whom, prior to July 15th and after
the receipt of Sullivan's telegram of July 6th, Rosenthal
had sold all of his and Sullivan's interest, wiring Sullivan
to that effect on July 15th, saying: "Corporation sold lease
and deposit for one thousand dollars. What shall I do with
your share?" and receiving in reply this answer: "Metson
represents us and has authority to collect our share of re-
covered deposit."

Because of the ostensible corporate ownership the form
which the transactions took was the following: The Wise
Realty Company sold its thousand shares of the Lincoln
Realty Company's stock to Williams for one thousand dol-
lars, Williams being admittedly the dummy representative of
Stewart and the transaction taking this form to avoid the
direct sale of this stock of the corporation to one who was a
director in both. The one thousand dollars was paid to the
Wise Realty Company and the stock was delivered to Will-
iams who immediately assigned it to Stewart. Thus, of the
one thousand and three issued shares of stock of the Lincoln
Realty Company Williams acquired by this transaction one
thousand shares, Rosenthal's one share and Sullivan's one
share to the extent that Rosenthal was authorized to rep-
resent Sullivan in making the sale. Stewart interviewed
Mr. Metson, who was Sullivan's attorney at law, and Mr.
Bernard, who, to a limited extent, was Mr. Sullivan's attor-
ney in fact, and sought the physical indorsement and delivery
to himself of the one share of the Lincoln Realty Company's
stock standing in Sullivan's name upon the representation
that he had purchased it with the Rosenthal interest in the

manner above indicated. Mr. Metson refused to make this delivery unless Mr. Sullivan was paid the full amount which he had invested.

While, as has been said, no direct information was conveyed to Sullivan of the fact that the lease was modified, substituting a five thousand dollar cash deposit for the twenty-five thousand dollar undertaking, Sullivan in Alaska was not unaware that something of this kind must have been done for he testifies that when he sent the telegram of July 6th above quoted authorizing Rosenthal to accept any proposition "he realized that if the deposit bond was not forfeited then the lease had been duly executed and the bond given or time for doing these things had been obtained, or some substitute for the bond had been arranged."

The subsequent acts of Stewart here require brief presentation. He had purchased the Rosenthal interest and over this there is not the slightest controversy. He believed that he had also purchased the Sullivan interest. He had left five thousand dollars of the ten thousand dollars' deposit as the cash deposit called for by the lease. He used the rest of the money with other money which he borrowed in payment of installments of rent as they came due, and he energetically endeavored to enlist upon satisfactory terms capital to aid him in his enterprise. He was unsuccessful in so doing. Finally, in September he received an offer for the outright purchase of the lease. Again, because of the corporate character of the ostensible ownership of the lease, that ownership being represented by the one thousand and three shares of the Lincoln Realty Company, the purchase was to take the form of a sale by Stewart with good title of this one thousand and three shares of stock. The purchase price was about one hundred and twenty thousand dollars. The net profit of Stewart, reduced by expenditures and obligations, was the difference between one hundred and twenty thousand dollars and thirty-five thousand dollars. An examination of the records of the corporations cast doubt upon the validity of the purchase by Stewart of the Sullivan share of stock, which doubt was increased by the fact that Stewart could not physically deliver possession of the stock. The associates who contemplated this purchase from Stewart declared that they would withhold twenty thousand dollars to meet any possible demand of Sullivan until Stewart could establish

clear title to the Sullivan interest. These associates are the other defendants in this case. Mr. Stewart then went to Mr. Metson and Mr. Bernard and paid them in full the amount of their demand in behalf of Sullivan, the $3333.33 which he had invested with interest thereon. This was on October 5th. Upon the next day, Sullivan, who had returned from Alaska, ratified in writing the sale and transfer and assignment of his interest so made and having received in full the amount of his demand, relinquished any claim to any share of the one thousand dollars paid nominally by Williams, but actually by Stewart to the Wise Realty Company. This ratification by Sullivan was made in the presence of and after a conversation with Stewart, in which conversation Stewart did tell Sullivan that he was disposing of all his (Stewart's) interest in the venture, that the burden was greater than he could carry, but did not tell Sullivan what price he was receiving for his interest. The second element of fraud is predicated upon Stewart's secrecy in this regard and is, of course, based upon the contention that the relationship of associates or partners with the consequent duty of full disclosure still existed between the parties.

It is because of this asserted continuing relationship and because of the notice of Sullivan's interest which it is asserted was brought home to the other defendants that they in turn are charged as having purchased the stock with knowledge and as thus becoming trustees *ex maleficio* for Sullivan.

The trial court took the view and made findings in accordance therewith that the sale by Sullivan of his interest was authorized by his telegram of July 6th, was effectuated by Rosenthal under the power conferred by that telegram and was accepted by Sullivan in his telegraphic answer to Rosenthal's telegram to him of July 15th. If the findings covering this matter are supported that is the end of this controversy, for with the consummation of that sale the relationship of associates or partners between Sullivan and Stewart immediately ceased and Stewart was perfectly justified in dealing thereafter with Sullivan at arm's length.

Some of the attacks made upon these findings are in their nature indirect. Thus, the validity of all of these corporate transactions is assailed upon various grounds as for a failure to comply with the by-laws in calling the meetings, the failure to notify Sullivan, who was in Alaska, as the by-laws re-

quired, the participation by Rosenthal as director in the transactions after he had sold out to Stewart and thus stripped himself of his actual ownership of the stock of the Wise Realty Company and the Lincoln Realty Company, and the sale by the Wise Realty Company of all its property consisting of the one thousand shares of the stock of the Lincoln Realty Company without ratification by the stockholders. Mistakes and misrepresentations in the minutes of the meetings are also charged as having been incorporated therein with fraudulent design, though they could not have deceived Sullivan, who was in Alaska, and knew nothing of them. The complete answer to all of these matters is found in the familiar principle that equity will look through form to substance, and so looking, it is beyond controversy that these corporations were but the mere instrumentalities through which the associates acted. If the transactions between the associates themselves were fair, then, as there are no rights of independent and nonparticipating stockholders involved, the corporate irregularities, however serious, mean nothing. If it were necessary equity indeed would compel the corporations themselves so to adjust, remodel, and reform their transactions as to give them a legal validity commensurate with their equitable validity.

For these reasons no force attaches to these corporate irregularities as between the associates themselves. If, in other words, Sullivan did authorize Rosenthal to sell his interest and Rosenthal did do this thing, that the mere mechanism of the sale creaked, groaned, was faulty, or even broke down would not impair the essential validity of the sale itself nor the fair dealing of the parties as between themselves. Only when third persons such as the other defendant undertook to buy the corporate stock would any substantial interest in the irregularities of the corporate transactions arise and these irregularities become important; and it was against these irregularities, as we have seen, that these associates undertook to protect themselves by withholding twenty thousand dollars to meet the possible claims and demands of Sullivan. When Stewart produced to them the indorsed stock with Sullivan's ratification of the transaction then they concluded their purchase from Stewart and paid him the full amount of money.

We may now at last come to the consideration of the vital issue in this case. Are the court's findings to the effect that Sullivan was not defrauded by Stewart and did not rely upon the statement in the telegram of July 1st that the deposit would be forfeited, supported by the evidence? That Sullivan in authorizing the sale of his interest did not rely upon this statement (which the associates believed was true when made) is manifest from his own testimony above quoted. Moreover, his answering telegram of July 6th is not an acceptance of the Stewart offer embodied in the telegram of July 1st, but to the contrary is a personal telegram to his friend Rosenthal authorizing the latter to sell his interest under "any proposition that has any of our money." It was thus a broad authority to Rosenthal to sell. Rosenthal sold, knowing all of the essential facts. The court so finds. He sold his own interest upon the same terms, five hundred dollars cash and the balance of the amount of money he had invested payable in the event that Stewart should be able to make a sufficient profit out of the venture. If it be a fraud at all it is Rosenthal's fraud in selling out Sullivan, yet Rosenthal sold out Sullivan's interest upon the same terms as he sold his own and promptly notified Sullivan by personal wire that he had done so, in response to which Sullivan notified Rosenthal that Mr. Metson had authority to collect his share of the proceeds of the sale.

In view of this record it may not be said that the findings of the court declaring that in July Sullivan had fully and fairly parted with his interest in the venture are not supported, and this vital fact being absolutely determinative of the controversy renders unnecessary the consideration of any other issues or arguments in the case.

The judgment and order appealed from are therefore affirmed.

Melvin, J., Shaw, J., Sloss, J., Lorigan, J., and Angellotti, C. J., concurred.

Rehearing denied.