[L. A. No. 10057. In Bank.—September 26, 1929.]

CONTINENTAL SECURITIES AND INVESTMENT COMPANY (a Corporation), Appellant, v. W. D. RAWSON et al., Respondents.

O. P. Soule (of Utah Bar), Halverson & Halverson and George Halverson for Appellant.

Dryer, Castle, McConlogue & Richards for Respondents.

SHENK, J.—This is an action wherein it is sought to compel the defendants to make an accounting of certain transactions alleged to have taken place on behalf of the plaintiff corporation. The defendants, W. D. and Lydia K. Rawson, filed a cross-complaint to quiet their title to the real properties involved in the transaction. Findings and judgment went for the defendants and their title as cross-complainants was quieted. The plaintiff appeals under the so-called alternative method.

John F. Rawson and the defendant W. D. Rawson are brothers. While both were residing in Utah and in 1916 they with others organized the plaintiff, the Continental Securities and Investment Company, under which the two brothers, as principal owners of the stock of the corporation, conducted a general real estate and stock and bond brokerage business. When the Securities Commission Act or so-called "Blue Sky" law of Utah went into effect in 1919 (Laws 1919, chap. 111), the plaintiff corporation ceased to do a brokerage business in that state, although it continued to maintain an office in Salt Lake City. In June, 1918, the brothers acquired all of the stock of the corporation and thereafter continued to own the same in equal proportions. After the Utah Securities Commission Act went into effect the defendant, W. D. Rawson, remained for a time in Utah selling stock of the Utah-California Oil Products Company. Later in 1919 he came to California in connection with the business of the latter company and has

remained here in business in and around Los Angeles. In 1920 he organized the United States Oil Company. Thereafter and until June, 1922, he engaged in promoting the interests of both oil companies and in conducting a brokerage business for himself. In June, 1922, John F. Rawson made a trip to Los Angeles at the suggestion of his brother. Prior to that time W. D. Rawson had negotiated for the subdivision of forty acres of land in Orange County belonging to Henry and Cordelia Winters with the view of selling the same in small lots with certain reservations as to oil production. In July, 1922, the first contract was entered into between the plaintiff corporation and Henry Winters and wife for the sale of the Winters tract in lots of 25x25 feet in dimension with two acres reserved for "club" and oil-drilling purposes. On July 18, 1922, an application was made by the plaintiff to the real estate commissioner for a real estate broker's license. On July 21, 1922, the plaintiff, as a foreign corporation, filed its articles of incorporation with the Secretary of State, complied with all of the laws of the state of California and thus became entitled to do business in this state. A bank account was opened in the name of the plaintiff corporation consisting of $1688.11, joint funds of the brothers, and $805 furnished by W. D. Rawson. With these funds the land was surveyed, corporate stationery, including letter-heads in the usual form, were purchased, a lecture hall 30x70 feet long was constructed at an expense of some $1500 dollars and a lot selling campaign was started. The venture at first met with scant success, for only fourteen or fifteen lots were sold. Liabilities in excess of receipts were incurred. Also, the plaintiff was notified that, owing to the form of the contract with the purchasers of lots, the Corporate Securities Act of this state (Stats. 1917, p. 673), was being encroached upon and that it would be necessary for the plaintiff corporation to secure a permit from the commissioner of corporations if it desired to carry on its lot selling campaign under the plan then in force. After consulting at some length with reference to the prospects, John F. Rawson announced to his brother that "he didn't think he wanted to stay" in California any longer; that it "didn't look like" they would be able to succeed in selling the subdivided tract, and that he "felt that he would go home, and as his son was now getting

married, that he would go home and go in business with him." W. D. Rawson testified: "And I told him if he left me now with all these difficulties on my hands, and this matter to straighten out, that it created a great hardship upon me, and I tried to persuade him to remain here and help me, and would eventually get a contract worked out so that this thing could be sold. . . . His response to that was that he felt that he owed a duty to his son, and that he preferred to go home and go in business with himself, and that I could work out something here for myself." The "difficulties" which W. D. Rawson had in mind were that their funds were exhausted, debts had been incurred and it appeared that it would be necessary to refund the money paid by the purchasers to whom the fourteen or fifteen lots had been sold. Under these circumstances John F. Rawson returned to Salt Lake City about August 17th, and engaged in business with his son under the name of the plaintiff corporation.

W. D. Rawson then entered upon negotiations to obtain a new contract with the Winters, which he concluded under date of August 22, 1922. This contract was in writing. The Winters were named as the parties of the first part and Continental Securities and Investment Company, a corporation organized and existing under the laws of the state of Utah, as party of the second part. The corporate name was signed to the document by W. D. Rawson, president, and J. F. Rawson as secretary. Under date of August 23, 1922, W. D. Rawson mailed to his brother at Salt Lake City a copy of the new contract, and in the letter accompanying the same told his brother that he had signed the brother's name as secretary, explained the terms of the new contract and his plans for a new lot selling campaign in considerable detail and stated: "Can tell you more after a few days run. I am having a hell of a time with bills and no money to pay them because must have some to start up with. Anything you can send will help much in getting started up."

Under the contract of August 22, 1922, the plaintiff corporation was constituted the exclusive fiscal agent of the Winters in the sale of the lots. W. D. Rawson immediately entered upon a renewed lot selling campaign, printed maps, literature, cards and stationery, all in the name of the

plaintiff corporation, employing numerous salesmen and carrying on all of the business in the name of the plaintiff corporation. A trust agreement to handle the proceeds from the sale of the lots and the conveyance of title was entered into with a local bank with the plaintiff corporation as a party thereto. The sale of lots developed slowly through September and much of October, but in the latter part of October, 1922, sales were frequent and the returns were large. By July, 1923, the larger part of the Winters tract was sold, and the Winters were paid the balance of the purchase price to them, the total being $70,000. About May, 1923, W. D. Rawson made arrangements for the purchase of the Edenwild tract from Fred W. Griffith for the sum of $30,000 on terms of $5,000 cash and the balance in notes secured by a trust deed on the property. When asked to whom the Griffith deed should run as grantee, W. D. Rawson replied, ''To the Continental Securities and Investment Company.'' When requested for a resolution of the board of directors authorizing the execution of the trust deed back to Griffith, W. D. Rawson stated that it would be unnecessary to go to that trouble, but to make the deed run to W. D. Rawson, which was done under date of June 4, 1923. W. D. Rawson then paid the initial payment of $5,000 by check made in the name and from the funds on deposit in the name of the plaintiff corporation. From sales in the Winters tract and in the Edenwild tract the deposits in the bank to the credit of the plaintiff corporation totaled $232,368.45. In January, 1924, W. D. Rawson organized the Continental Finance Corporation under the laws of this state, continued thereafter to transact the same business as theretofore conducted under the name of the plaintiff corporation, and the deposits to the credit of the Continental Finance Corporation from January 18, 1924, to October 15, 1925, totaled $79,959.52. The trial of the action was commenced on November 10, 1925.

After the efforts of W. D. Rawson, all in the name of the plaintiff corporation, were plainly meeting with success and, according to his testimony, some time between January and June, 1923, he went to the Winters, reported to them that John F. Rawson had gone back to Utah and was no longer interested in the Winters tract enterprise and requested them to change the fiscal agency contract of August 22, 1922, so as

to name W. D. Rawson individually as the agent. The Winters complied with the request, signed a new contract embodying the same terms as the contract of August 22d, but substituting the name of W. D. Rawson for the name of the plaintiff corporation wherever the latter appeared in the old contract. Thereupon, in the presence of the Winters, W. D. Rawson "tore up" the contract of August 22, 1922, made in the name of the corporation. On September 6, 1922, W. D. Rawson wrote to his brother stating that he was about ready to start; that "the new plan appeals but can't say how it will sell, and if it don't I am down and out for I have spent my last dollar. . . . Will know tomorrow how business is going. Will drop you a line when I come in, all is rush now." On September 7th John F. Rawson wrote to his brother from Salt Lake City stating that he had "broken up" the office there and was negotiating for the sale of the office furniture; that he had been unsuccessful in selling his home on satisfactory terms and concluded: "Realizing your position as I left you—the perils and hazards of the situation I have watched every mail with the hope you would keep your promise and advise me of the conditions. I can only imagine one interpretation for your long silence and that is continued adversities. Your silence interpreted by me thus has caused me to play more cautiously, to halt, to hesitate, to be indecisive. If the business has gone bad with you there which I am inclined to infer and we can establish a business here that is substantial, lucrative and on a broad enough basis, I am sure we shall be glad to invite you to join us. . . . I have negotiations under way for the office furniture; negotiations for the sale of my home and while negotiations along either line are not satisfactory to me they may become so and I may advise you I am loose here and starting for there; but I cannot hardly believe I shall be successful for a little time yet." Under date of September 11, 1922, W. D. Rawson, still using the stationery of the Continental Securities and Investment Company, fiscal agents, W. D. Rawson, managing director; J. F. Rawson, secretary-treasurer, wrote to his brother as follows: "We have made two runs to Winters so far but without any sales. We start tomorrow to make steady runs. I now have about 45 salesmen and solicitors working and we expect 150 people out to-

morrow but can't tell with what results. . . . I haven't any money, in fact had $7.00 overdraft, not knowing you had drawn, so I am holding on and hoping; if money comes soon we survive, otherwise bust, with bills galore. I believe, however, it will go this time, tho the profit will not be large but it will be a start along a new line of business." On October 21, 1922, W. D. Rawson wrote to his brother as follows: "There has not been anything developed of material interest in the [Winters] Subdivision, and I am arranging to take in a bunch of fellows who ought to be able to get an organization so that the property can be handled. Of course, I will have to make concessions to suit them, owing to circumstances which you are well acquainted with. I had great hopes in Brown, but have waited as long as it is possible to wait. Therefore, any plans that we previously had will have to be forsaken, so I hope that you and Brown will be able to succeed in the Bear Lake and Mineral Point undertakings. We went down to the property yesterday, but did not have anyone there to make any sales to." Again on January 18, 1923, W. D. Rawson wrote to his brother as follows: "I am working with a group of fellows here. We are handling all kinds of real estate, exchanges, and business chances. And in fact most everything that we can get to handle that is marketable here. Do not know just how successful we will be yet as it is something new, and has not been fully tried out. . . . I am still working to clear up the outstanding obligations of the Continental incurred in the early subdivision undertaking, but just how long it will take I cannot tell." Under date of February 22, 1923, John F. Rawson wrote to W. D. as follows:

"Attached to this letter is a clipping of an ad of some fellow who says he has some money to invest. I am making an effort to get in touch with this fellow with a view of interesting him in the Winters' contract. I hope that the Winters' line-up is in shape so we can take this fellow on if I catch him. I wish you would tell me frankly and by return mail what the chances are for me to make a living and some money if I came to Los Angeles and help in the business there. Can we put the Winters' over? I have got to move here now. I must either join you in Los Angeles or I must enter into business alliances

here which will make it impossible to join you. . . . I want your reply as to the business outlook by return mail." Finally on February 28, 1923, W. D. Rawson wrote to his brother as follows: "Yours of the 22nd inst. received and carefully noted. Also the clipping of the ad attached, but we cannot do anything in the way of taking the party in on handling Winters' property. The Corporation Commission rule that the Club memberships, as arranged when you were here, are a security and have tied the matter up for considerable time. In fact, every move that has been made they have undertaken to kill the proposition.

"Real estate is not moving in Los Angeles. We have worked for two months on local business and haven't made a single sale.

"We are now looking at some mining property with the view of taking hold of it, but do not know yet what the results will be. Business is quiet so I cannot offer any encouragement in anything.

"Brown was here about a month ago and I showed him things as they were at that time and there isn't any improvement, so he decided to continue with his soap people. We have been expecting for weeks that something might pick up in the way of business but it seems to get worse, and every move that is made the Commission put their stamp of disapproval on, so that it is almost impossible to do anything except work for wages for somebody else."

In July, 1923, John F. received information that there had been much activity and success with sale of lots in the Winters tract since October of the previous year, and contrary to his brother's "discouraging" letters from October 21st on. He went to Los Angeles, became acquainted with the true situation and demanded an accounting from his brother. After many conferences between the two and failing to arrive at a solution of their difficulties, they came to a final break in October, 1923. On January 5, 1924, a meeting of the stockholders of the plaintiff corporation was held in Salt Lake City, directors were elected and the board was organized with Roscoe, son of John F. Rawson, as president; Kate Rawson, vice-president, and John F. Rawson, secretary-treasurer. On January 8th, by authority of the board of directors, John F. Rawson, on behalf of the plaintiff corporation, made a demand on

W. D. Rawson for an accounting of all of the latter's transactions with relation to the business of the plaintiff corporation in the state of California. Following a refusal to comply with the demand this action was brought on March 14, 1924.

From the standpoint of the plaintiff the case was tried and is now presented on the theory that on the facts the brothers were the equal owners of the stock of the plaintiff corporation, with W. D. Rawson as the managing director and John F. as the secretary-treasurer; that all of the transactions from the inception of the Winters tract enterprise down to the demand of the plaintiff corporation for an accounting were corporate transactions in which each brother would be entitled to the proceeds in proportion to his stock ownership. On the part of the defendants the cause was tried and is now presented on the theory that the relationship between the two brothers was that of copartners; that upon the departure of John F. Rawson for Salt Lake City on August 17, 1922, he abandoned the partnership enterprise and effected a dissolution of the partnership by his failure to perform his duties under the alleged agreement of partnership as provided in subdivision 2 of section 2452 of the Civil Code as it existed prior to August 14, 1929; that during all of said transactions the plaintiff corporation was but the alter ego of the two brothers; that the corporation was a two-man corporation whose corporate existence should be disregarded in adjusting the rights of parties; that the success in handling the two tracts of land was due entirely to the efforts and activities of W. D. Rawson and that it would be inequitable to permit John F. Rawson to share in the proceeds.

The court found in favor of the defendants on their theory of the case and entered judgment dismissing the action. The main contention of the plaintiff on the appeal is that the evidence is insufficient to support the findings so made.

The foregoing statement of facts is supported by the record without substantial conflict. From what has been related and from further examination of the record it is established without question and without any substantial showing to the contrary that the plaintiff corporation was at all times involved in the controversy a legal entity en-

titled to transact business in the states of Utah and California; that from the inception of the Winters tract enterprise all of the activities of W. D. Rawson were carried on in the name of the plaintiff corporation down to the time of his organization of the Continental Finance Corporation in January, 1924, and that there was no thought or purpose on the part of W. D. Rawson to dispute or deny the rights of his brother as a stockholder in the corporation until the Winters enterprise was plainly approaching success. He then entered upon a wilful and deliberate scheme of misrepresenting to his absent brother the conditions as they truly existed. In the execution of his purpose he sought to extinguish his brother's rights by tearing up the contract of August 22, 1922, made in the name of the corporation and prevailing upon the Winters to sign a new contract of the same date, substituting his own name in the place of the corporate name. If the relationship of the brother was that of a copartner and the copartnership was dissolved on August 17, 1922, when John F. Rawson returned to Salt Lake City, as contended by the defendants, what was the purpose of W. D. Rawson in misrepresenting to his brother the true situation with reference to sales in the Winters tract as disclosed by his letters written to his brother from October 21st on, when in fact the success of the enterprise appeared beyond question, and in attempting to wipe out his brother's interest by destroying the contract made in the name of the corporation in which the absent brother had a half interest? The only rational conclusion to be drawn from the evidence is that all of the transactions here involved were transactions of the plaintiff corporation, as such, and were so considered by W. D. Rawson until he conceived the plan to deceive his brother as to the corporation's success. The plaintiff corporation was domesticated in this state for the purpose of transacting business here. All letter-heads, literature, contracts and bank accounts were in the name of the corporation. Accounts were kept and W. D. Rawson made income tax returns in the name of the corporation. Real estate broker's licenses were obtained in the name of the corporation. It is not seriously contended by the defendants that the misrepresentations were not made by W. D. Rawson to his brother. ■ It is argued, however, that because the

court found the plaintiff corporation to be a two-man corporation and that the interests of the brothers were equal, the court should cast aside the corporate veil and award the proceeds of the transactions to the defendants because, in truth, the success ultimately attained was due to the efforts of W. D. Rawson after the departure of his brother from the state. The documentary evidence discloses without substantial conflict that the absent brother was ready and anxious to return to California if conditions would seem to render it probable that he could further the enterprise by his assistance. If the other original stockholders in Utah who sold their holdings to the brothers had retained their stock interests there could be no reasonable basis for the claim that they, although absent from this state, would not be entitled to share in the profits of the corporation's activities, notwithstanding said profits might accrue only because of the energy, foresight and ability of the corporation's managing director. The fact that the brothers became the sole owners of the stock did not destroy the interests of either and a court would not be justified in wiping out the interest of either in favor of the other unless it be made to appear that in the interest of justice or to prevent fraud the corporate entity should be disregarded.

■ In *Minifie* v. *Rowley*, 187 Cal. 481, at page 487 [202 Pac. 673, 676], it was said: "Before the acts and obligations of a corporation can be legally recognized as those of a particular person, and *vice versa,* the following combination of circumstances must be made to appear: First, that the corporation is not only influenced and governed by that person, but that there is such a unity of interest and ownership that the individuality, or separateness, of the said person and corporation has ceased; second, that the facts are such that an adherence to the fiction of the separate existence of the corporation would, under the particular circumstances, sanction a fraud or promote injustice. (*Erkenbrecher* v. *Grant,* 187 Cal. 7 [200 Pac. 641]; *Llewellyn Iron Works* v. *Abbott Kinney Co.,* 172 Cal. 210 [155 Pac. 986].)" (See, also, *Wenban Estate, Inc.,* v. *Hewlett,* 193 Cal. 675 [227 Pac. 723].)

When the corporation is organized or perpetuated for the particular purpose of carrying out the plans of partners or associates in business, the same rule has been held to

apply. (*Wise Realty Co.* v. *Stewart*, 169 Cal. 176 [146 Pac. 534]; *Shorb* v. *Beaudry*, 56 Cal. 446; 6 Cal. Jur., p. 595.) Whether the corporation be deemed a "one man" corporation or, as here claimed, a "two man" corporation, the rule would be the same and the two essential elements must be present. The first element, viz., the absolute control of the corporation at the times in question was in the hands of the brothers, was present. But the second element, viz., a state of facts upon which the adherence to the fiction of the separate existence of the corporation would sanction a fraud, is lacking. On the contrary, there is present herein such a state of facts that if the corporate existence is to be disregarded the result will be to sanction the fraud of one brother against the other and permit the one to become enriched by his own dishonesty and deceit. Whereas, if the separate corporate existence be adhered to, such a result will be prevented. If the brother in Utah had been truthfully informed of the approaching success of the Winters tract enterprise the conclusion is inevitable from the record that he would have joined his brother in Los Angeles and assisted in promoting the project, in which event their original understanding would have been carried out whether they operated under the name of a corporation or under an authorized fictitious name or in their individual names. It is by reason of the wrongdoing of W. D. Rawson that the defendants are now endeavoring to erect, a barrier to the accounting and in doing so are seeking the aid of a court of equity in accomplishing the purpose. Equity will not so lend its aid and the chancellor should lend a deaf ear to the plea.

Therefore, since the defendants must be held to the corporate form of the transactions conducted by W. D. Rawson, it would seem to be quite immaterial whether John F. Rawson was in Utah during the time that the business was being conducted by the corporation. Wherever he might be his stock ownership was sufficient evidence of his interest in the corporate transactions. No contention is advanced that the corporation may not in a proper case call to account one of its officers on behalf of its stockholders.

There is and can be no criticism of the conduct of the individual defendants other than W. D. Rawson.

The defendants, trustees of the Winters Club, were innocent participants in carrying out the purposes of an obviously legitimate common-law trust, but their rights, so far as the accounting is concerned, are in law no more immune from accountability than the defendant, W. D. Rawson, himself.

The judgment is reversed.

Waste, C. J., Curtis, J., Richards, J., Seawell, J., Preston, J., and Langdon, J., concurred.