## IMPERIAL PAPER & COLOR CORPORATION v. SAMPSELL.

### No. 9422.

Circuit Court of Appeals, Ninth Circuit.

Aug. 12, 1940.

Rehearing Denied Sept. 7, 1940.

Hiram E. Casey, of Los Angeles, Cal. (Horace W. Danforth, of Los Angeles, Cal., of counsel), for appellant.

Craig & Weller, Frank C. Weller, and Thomas S. Tobin, all of Los Angeles, Cal., for appellee.

Before WILBUR, DENMAN, and MATHEWS, Circuit Judges.

MATHEWS, Circuit Judge.

Wilbur J. Downey filed a voluntary petition in bankruptcy on November 18, 1938. Adjudication followed on November 19, 1938. Appellee was appointed trustee and, as such, took possession of and sold property—a stock of merchandise—belonging to Downey Wall Paper & Paint Company, a California corporation. Thereafter appellant, a creditor of the corporation, filed its claim for $5,415.95. This was a claim against the proceeds of the corporation's property which were then, and presumably are still, in appellee's hands. As against said proceeds, appellant prayed that its claim be accorded priority over those of the bankrupt's creditors. To this appellee objected. A hearing was had and, on September 28, 1939, the referee entered an order which allowed appellant's claim as a general unsecured claim against the bankrupt estate, disallowed it as a prior claim and declared that appellant had no right to the proceeds of the corporation's property except as a general unsecured creditor of the bankrupt. The referee's order was reviewed and affirmed. From the order of affirmance this appeal is prosecuted.

The record[1] discloses the following facts:

Prior to filing his petition in bankruptcy, the bankrupt was at all pertinent times a retail merchant residing and doing business in Los Angeles, California. Prior to April 1, 1933, he and one Gotwals were partners doing business as Downey & Gotwals. On April 1, 1933, Downey & Gotwals owed Standard Textile Products Company (hereinafter called Standard) for merchandise sold and delivered to them $126,360.72. On April 1, 1933, the partnership was dissolved. Of the $126,360.72 which the partners owed Standard, the bankrupt assumed and agreed to pay $125,060.72. In evidence thereof, he executed and delivered to Standard two promissory notes dated April 1, 1933, payable on demand—one for $111,060.72, without interest, and one for $14,000, with interest at 6% per annum payable quarterly.[2]

Also, on April 1, 1933, the bankrupt and Standard entered into a contract[3] whereby Standard appointed the bankrupt as one of its distributing agents and agreed to provide him with a "consigned stock of its products"[4] sufficient to enable him to carry on business as such distributing agent. The bankrupt agreed to carry on said business and to pay Standard, for application on his notes, "all of the net proceeds derived by [the bankrupt] from the operation of said business in excess of the actual operating overhead, including any money realized by [the bankrupt] from the sale and/or liquidation of any or all of his assets, irrespective of whether derived from said business or not."

The bankrupt's contract with Standard did not preclude him from carrying on a general mercantile business. He did carry on such business from April 1, 1933, until the filing of his petition in bankruptcy. Part of his stock in trade was obtained from Standard, part of it elsewhere. Prior to July 28, 1936, he dealt, among other things, in wall paper and paint, neither of which was obtained from Standard.

Appellant was at all pertinent times a manufacturer or wholesaler of wallpaper. In April, 1936, the bankrupt, desiring to purchase wall paper from appellant on credit, conferred with appellant's president and was told by him that appellant would extend no credit to the bankrupt unless the bankrupt's indebtedness to Standard was settled. The bankrupt's indebtedness to Standard was never settled. Consequently, appellant never sold the bankrupt any wall paper and never became a creditor of the bankrupt.

On June 17, 1936, the bankrupt's attorney, Frank S. Hutton, acting for and on behalf of the bankrupt, advised appellant that the corporation—Downey Wall Paper & Paint Company—was being organized with a capital of $15,000, with the bankrupt, his wife (Mildred Downey) and his son (David Downey) as incorporators; that its capital stock ($15,000) would be issued to its incorporators, one-third to each, and would be paid for by them; and that the bankrupt proposed to sell the corporation his then existing stock of wall paper and paint.

The corporation was organized on or about July 1, 1936. Its incorporators and shareholders were the bankrupt, his wife and his son. Its shares had a par value of $100 each.[5] We assume—there being no evidence to the contrary—that the shares were issued and paid for as the bankrupt's attorney had told appellant they would be. Thus we assume that 50 shares were issued to and paid for by each of the incorporators. The bankrupt apparently did not retain all of his 50 shares. In Schedule B(3-b) annexed to his petition in bankruptcy, he stated that, at the time of filing the petition, he owned 27 shares. In his testimony before the referee, he stated that, at the time of filing the petition, he owned five shares. Which, if either, statement was correct we do not know. It is clear, however, that the bankrupt never owned more than one-third of the corporation's stock and, at the time of filing the pe-

---

[1] The record on appeal consists of (1) a record filed on January 17, 1940, and (2) a supplemental record filed on July 12, 1940, pursuant to Rule 75(h) of the Federal Rules of Civil Procedure, 28 U.S.C.A. following § 723c.

[2] These facts appear from one of the two proofs of debt filed by Standard's assignee, Standard Coated Products Corporation. Both proofs are part of the supplemental record on appeal.

[3] A copy of the contract is attached to one of the two proofs of debt mentioned in footnote 2.

[4] Standard was a manufacturer or wholesaler of oilcloth and the like.

[5] This appears from Schedule B(3-b) annexed to the petition in bankruptcy. Schedule B(3-b) is part of the supplemental record on appeal.

tition, may have owned as little as one-thirtieth.

On July 21, 1936, the bankrupt, pursuant to the California bulk sales law (Civil Code, § 3440), recorded in the office of the county recorder a notice of the intended sale of his then existing stock of wall paper and paint to the corporation. The notice stated that the sale would be made on July 28, 1936, for a consideration of $7,500 represented by the corporation's promissory note payable six months from that date. The sale was made pursuant to the notice. Thereafter the corporation dealt in wall paper and paint, and the bankrupt dealt in other merchandise. The corporation and the bankrupt occupied the same premises, the corporation being the bankrupt's tenant. There was, however, no intermingling of their goods. The corporation's business was separate and distinct from that of the bankrupt.

At the time of the sale by the bankrupt to the corporation—July 28, 1936—Standard was the bankrupt's only creditor. At that time the contract of April 1, 1933, between Standard and the bankrupt[6] was still in force. Thereby the bankrupt was required to, and presumably he did, pay over to Standard or its assignee,[7] for application on his notes, all money realized from the sale made by him to the corporation on July 28, 1936.

The bankrupt received in consideration of the sale the corporation's note for $7,500, of which it is conceded $5,000 was paid. The bankrupt testified before the referee that the balance ($2,500) was not paid. As to this, however, the bankrupt's testimony may well be doubted. From Schedule B(2-b) annexed to the petition in bankruptcy, it appears that, at the time of filing the petition, the bankrupt did not own or hold any promissory note. From Schedule A(3) and from a proof of debt filed by the corporation,[8] it appears that, at the time of filing the petition, the bankrupt was not a creditor of the corporation, but was indebted to it in the sum of $1,625. Therefore, we think it may reasonably be inferred that the corporation's note for $7,500 was fully paid, and that Standard or its assignee received the full amount thereof.[9]

Standard and its assignee were fully advised of the sale by the bankrupt to the corporation. Neither of them objected or complained. Instead, with full knowledge of the sale, Standard and its assignee extended further credit to the bankrupt to the amount of more than $5,000.[10]

Between September 26, 1936, and September 26, 1938, appellant sold and delivered to the corporation, on credit, wall paper for which, on September 26, 1938, the corporation owed appellant $5,415.95. In evidence thereof, the corporation executed and delivered to appellant four promissory notes dated September 26, 1938—three for $1,500 each payable in two, three and four months, respectively, and one for $915.95 payable in five months, all bearing 6% interest from date. No part of this indebtedness has been paid. Payment thereof from the proceeds of the corporation's property was and is sought by appellant in this proceeding.

Appellee's objections to appellant's claim were (1) that appellant's proof of debt did not state facts sufficient to bring said claim within the provisions of § 64, subs. a or b of the Bankruptcy Act,[11] relating to "Debts [of bankrupts] which have priority;" and (2) that it appeared on the face of said proof that the debt due appellant was contracted on open account and wholly unsecured, and that appellant did not have or claim any lien on the assets of the bankrupt estate—all of which was quite true and quite immaterial. For the debt due appellant was not a debt of the bankrupt, but was a debt of the corporation. Appellant's claim was not a claim against the bankrupt estate, but was a claim against the proceeds of the corporation's property.

By the referee's order, the corporation's property and the proceeds thereof were treated as part of the bankrupt estate. In justification of the order, two contentions are made: (1) That the sale by the bank-

---

6 See footnote 3.

7 On November 29, 1937, all property and assets of Standard, including the bankrupt's notes and all rights of Standard under its contract with the bankrupt, were assigned and transferred to Standard Coated Products Corporation.

8 Schedules A(3) and B(2-b) and the corporation's proof of debt are part of the supplemental record on appeal.

9 It is undisputed that, prior to the filing of the petition in bankruptcy, Standard or its assignee received from the bankrupt, for application on his notes, sums aggregating more than $25,000.

10 This appears from one of the two proofs of debt mentioned in footnote 2.

11 11 U.S.C.A. § 104, subs. a, b.

rupt to the corporation on July 28, 1936, of the bankrupt's then existing stock of wall paper and paint was made with intent to delay or defraud the bankrupt's creditors and was, therefore, void against such creditors and against appellee;[12] and (2) that the corporation was the bankrupt's alter ego.

First. We do not think the evidence shows that the sale by the bankrupt to the corporation was made with intent to delay or defraud any creditor of·the bankrupt. But even if it did, that would not justify the referee's order, for the sale did not involve any property dealt with or affected by the referee's order. The sale was, as previously stated, a sale on July 28, 1936, of the bankrupt's then existing stock of wall paper and paint. That stock was disposed of by the corporation long prior to the filing of the petition in bankruptcy. Appellee never got possession of that stock or any part of it. The referee's order dealt, not with that stock, but with other property of the corporation—property which appellee took possession of and sold —and with the proceeds thereof in appellee's hands. That property was not purchased from the bankrupt.[13] The bankrupt never owned it, never had possession of it, never sold it or attempted to sell it. Therefore, the fact, if it be a fact, that .the sale on July 28, 1936, of the bankrupt's then existing stock of wall paper and paint was made with intent to delay or defraud the bankrupt's creditors is, for present·purposes, immaterial.

Second. The corporation was organized under and existed by virtue of the laws of California. Its business was transacted in California, its property was in California and its stockholders, including the bankrupt, resided in California. This case was tried in a federal court sitting in California. Hence, in determining the relationship of the corporation and the bankrupt to each other and ·the effect thereof, the applicable law is that of California. In California, when one person owns all the stock of a corporation and uses the corporation as a mere conduit for the transaction of his own business, the corporation is regarded as his alter ego. Wenban Estate v. Hewlett, 193 Cal. 675, 227 P. 723. See, also, Minifie v. Rowley, 187 Cal. 481, 202 P. 673; D. N. & E. Walter & Co. v. Zuckerman, 214 Cal. 418, 6 P.2d 251, 79

A.L.R. 329; In re Sterling, 9 Cir., 97 F.2d 505.

In this case the referee's certificate stated that on April 7, 1939—several months prior to the order under review— he, the referee, had made an order "decreeing [the corporation] to be the alter ego of the bankrupt." But, as also appears from the referee's certificate, appellant was not a party to the order of April 7, 1939, or to the proceeding in which it was made and, consequently, was not bound thereby. In the case at bar, appellee did, not allege or ask the referee to hold that the corporation was the bankrupt's alter ego, nor did the facts warrant such a holding. For the bankrupt did not own all or even a majority of the corporation's stock. The evidence is that he owned less than one-fifth of it.

But even if it were true that the corporation was the bankrupt's alter ego, that would not justify the order under review. For not only did that order treat the corporation as the bankrupt's alter ego; it disregarded the existence of the corporation as a separate legal entity. To warrant such disregard of the corporation's separate existence it was necessary to show, not only that it was the bankrupt's alter ego, but that to recognize .its separate existence would promote fraud, defeat justice or produce inequitable results. Erkenbrecher v. Grant, 187 Cal. 7, 200 P.·641; Minifie v. Rowley, supra; Wenban Estate v. Hewlett, supra; Midwest Air Filters Pacific v. Finn, 201 Cal. 587, 258 P. 382; Continental Securities & Investment Co. v. Rawson, 208 Cal. 228, 280 P. 954; Wood Estate Co. v. Chanslor, 209 Cal. 241, 286 P. 1001; D. N. & E. Walter & Co. v. Zuckerman, supra; Hollywood Cleaning & Pressing Co. v. Hollywood Laundry Service, 217 Cal. 124, 17 P.2d 709; Dos Pueblos Ranch & Improvement Co. v. Ellis, 8 Cal.2d 617, 67 P.2d 340; In re Sterling, supra.

There was no such showing. Instead, it clearly appears that to disregard the existence of the corporation as a separate entity would do appellant a grave and palpable injustice. As against appellant, the corporation's property never belonged to the bankrupt or to the bankrupt estate; appellee never had any right to take possession of or sell said property; having done so, he never had, nor has he now, any right to the proceeds thereof. Appellant's

---

[12] California Civil Code, § 3439.

[13] Most of it was purchased from appellant.

claim should be allowed and, as a claim against the proceeds of the corporation's property, should be accorded priority, as prayed by appellant.

Order reversed and case remanded for further proceedings in conformity with this opinion.