[Civ. No. 14023. Second Dist., Div. Two. July 22, 1943.]

LAZARE M. KAUFFMAN, Respondent, v. LORRAINE K. MEYBERG et al., Appellants.

[Civ. No. 14024. Second Dist., Div. Two. July 22, 1943.]

LAZARE M. KAUFFMAN, Respondent, v. LEON, INC. (a Corporation) et al., Appellants.

Leonard J. Meyberg in pro. per., Mitchel S. Meyberg and Paul M. Joseph for Appellants.

O'Melveny & Myers, Pierce Works and W. B. Carman, Jr., for Respondents.

MOORE, P. J.—Two appeals are consolidated for the purpose of decision. The first action is to enjoin the defendants from interfering with plaintiff's right to vote 2,500 shares, or one-half of the capital stock of defendant corporation at

an election of directors. The second action was to nullify the election of directors effected at the meeting of the stockholders to which plaintiff's right to vote 2,500 shares was obstructed by defendants in spite of the restraining order issued at the inception of the first action. The two causes were tried together. Only one record was made. The court made findings and decision in each case and adjudged in the first suit that plaintiff was entitled to be protected in his right to vote one-half of the corporate shares at any meeting of stockholders and permanently enjoined defendants from obstructing plaintiff in the exercise of such rights. In the second action it was determined that the election of directors was in violation of plaintiff's right to vote one-half of the corporate shares and the election was nullified.

Plaintiff is hereinafter referred to as Lazare. He is the brother of defendant Lorraine K. Meyberg, hereinafter referred to as Lorraine. Defendant Leonard J. Meyberg is her husband and will be herein referred to as Meyberg. The parents of Lazare and Lorraine were Leon E. Kauffman and Clemence Kauffman, who, for brevity's sake, are hereinafter referred to respectively as Leon and Clemence. Clemence departed life November 18, 1932; Leon deceased December 4, 1935. They left a successful corporation, to wit, Leon, Inc., to their children in equal ownership. Lazare became its president, Lorraine, its secretary. An annual meeting was convened by defendants, Meyberg and Lorraine, for the avowed purpose of electing directors. Prior to the meeting Lazare learned of the plan of defendants to defeat his right to vote his stock at the annual meeting on January 27, 1941. He anticipated the overt act by procuring an injunction to prevent the threatened obstruction. But the election was held, and, ignoring the court's order, the defendants scorned plaintiff's rights as a holder of one half of the authorized and paid for stock and declared themselves and plaintiff elected directors for the year 1941. Subsequently, defendants were punished for violating the restraining order (affirmed, *Meyberg* v. *Superior Court,* 19 Cal.2d 336 [121 P.2d 685]), but they never took any steps to correct the injustice and, instead they maintained upon the trial their contention that no one can vote a share at a corporate election unless the share stands of record in his name, and they now persevere in upholding their reprehensible behavior as just and legal. A motion to

dismiss their appeal was presented contemporaneously with the submission hereof. It will be denied for the reason that a determination of such motion required familiarity with the merits of the entire cause whereby we may readily determine the merits of the appeal.

In March, 1942, defendants having failed to restore the *status quo ante* the meeting of January 27, 1941, plaintiff filed his second action under section 315, Civil Code, to annul the declared results. Upon the trial of both cases together the court decided for plaintiff and held that the corporation is subject to the jurisdiction of the superior court.

Appellants have set forth in voluminous briefs some fourteen points which they urge on appeal. They may be reduced to the following: (1) the evidence does not support the findings; (2) the court was without jurisdiction to interfere with the internal affairs of a foreign corporation; (3) errors of law in admitting testimony; (4) error in trying two causes together; (5) miscellaneous alleged errors.

(1) In their attempt to demonstrate that the evidence does not support the findings that plaintiff owned and was entitled to vote 2,500 shares and that he has equality of voting rights with defendants, the latter contend that at the time of the election of directors, there were only 1950 shares standing in the name of plaintiff, and that he in fact owned only 2,475 shares while defendants had of record 2,525 shares. They maintain that because they had in the aggregate a majority of the shares of record they were entitled to determine the election. But the evidence is overwhelming that plaintiff owns 2,500 of the 5,000 authorized shares and that Leon intended to leave his estate and particularly the shares in his last corporate venture in equal ownership to both of his children. Upon this finding the evidence is convincing. Inasmuch as the finding of plaintiff's equal ownership was derived from a determination that certificate 8 was a valid issue of 50 shares to him, this discussion will be confined so far as possible to a presentation of the origin and treatment of that certificate. Its issuance alone and its freedom from attack for over nine years cloak it with the presumption of validity. (Sec. 374, Civ. Code.) Its rightful place on the corporate records as evidencing 50 shares was never questioned by Meyberg although he had served Leon as attorney for years and was the master hand in guiding the corporation from the date of its birth to the date of the ill-starred election.

Never once from the day she became owner of 250 shares in January, 1933, did Lorraine express a doubt as to its validity or as to Lazare's ownership of one-half of the corporate shares. Meyberg testified that he had never raised a question about Lazare's right to certificate 8. In the minutes of the two meetings held in June and November, 1933, Meyberg entered after the name of Lazare "250 shares." This number was possible only by counting the 50 shares in 8. On several occasions he wrote Mr. Hawke, a corporation employee in Boston, that the two children share "equally in Leon Inc."; that neither owns more than the other. When two dividends were declared on the stock, $75,000 in December, 1939, and $50,000 in December, 1940, equal division was made between the two shareholders at a time when Lazare had only 250 shares in his name and Lorraine had none. (She had transferred her 250 shares to Meyberg.) Notwithstanding Meyberg was thus encompassed by a cloud of witnesses that he and his wife had long acquiesced in Lazare's equality with them in the ownership of the corporation and of certificate 8 in particular, defendants never ceased from their scheming to remove Lazare from the presidency. Inasmuch as their perfidy gleams most brightly in the light of their dealing with the stock of Leon Inc., these events can best be understood only by tracing the origin and course of those certificates used by defendants as the instruments of their chicanery.

While operating the L. Kauffman Company doing a wool and leather business at Vernon, suburb of Los Angeles, Leon organized *LEON, INC.* as an addition to his marketing facilities on the Atlantic seaboard. He incorporated it in 1932 under the laws of Delaware and established its principal place of business at Boston, Massachusetts. It was strictly a one-man corporation, a veritable instrumentality of its founder. He subscribed and paid for the entire authorized 5,000 shares, and caused them to be issued in the names of his nominees. The first certificates issued were to Boswell, 2,500 shares; Brandt, 1,000 shares; Andrews 50 shares, in certificates 2 and 3. August 15, 1932, he caused 25 shares to be transferred to Lazare and 25 to Lorraine. At the same time he had the 50 shares in certificates 2 and 3 transferred to Clemence and evidenced by certificate 6. He did not make delivery of certificate 6. It remained in the book until after the decease of Clemence on November 18, 1932. Having concluded to make

further gifts to his children and being sole devisee of Clemence, Leon caused 6 to be cancelled and certificate 8 thereupon to be issued to Lazare for 50 shares, December 12, 1932. The following month he carried out his plan to make the gifts by having 225 shares issued to Lorraine and an additional 175 shares to Lazare. Thus the records stood until the grim reaper had removed both parents from the earthly plane.

In the spring of 1937 the estates of both Clemence and Leon were approaching a readiness for distribution. The actual status of the stock then was as follows: Lazare and Lorraine each owned 250 shares, 50 of Lazare's being evidenced by certificate 8. The estates of Leon and Clemence each owned one half of the remaining 4,500 shares, although 1,000 of them remained "unissued." Factually and legally the 4,500 shares should have, in due course, been distributed to Lazare and Lorraine, share and share alike. But the divinity that shapes our ends was not to prevail without a dramatic contest with Meyberg. While Lazare was administrator with will annexed of the estate of Clemence and co-executor with his sister of the estate of Leon, Meyberg counseled both. In February he advised Lazare that certificate 6 had never been delivered; that it had been cancelled. In this he spoke the truth, for at Leon's direction, Meyberg had with his own hand cancelled that certificate in December, 1932. However, scarcely two months had passed when he "about faced" and stated to Lazare that after further investigation he was convinced that certificate 6 had been paid for; that it had been issued and never formally cancelled and should therefore be listed as an asset in the estate of Clemence. These facts are not disputed. To fortify such advice, Meyberg caused the words "cancelled, never delivered" to be erased from the stub of certificate 6, which fact was concealed from Lazare until it was brought to light by the use of infra-red photography by the expert witness, Clark Sellers, who testified that it was the hand of Meyberg which had *cancelled* certificate 6. His change of position, his denial of the cancellation, the failure of his memory with reference to it after Sellers had testified and his access to the stock book warranted the inference that he had caused the cancellation words on the stub of certificate 6 to be erased.

By his statements and concealments he induced Lazare to inventory the 50 shares of certificate 6 in the estate of Cle-

mence, and thereby cleared the way for challenging the validity of certificate 8. Because of this alteration of the records it was necessary to reduce the number of shares not yet issued to the extent of 50 shares to avoid an overissue. Whereupon on April 2, 1937, Lazare, relying upon the truth of Meyberg's counsel, agreed as follows: To inventory in the estate of Clemence one half of the community holdings of 4,450 shares and the 50 shares in certificate 6; that the unissued shares should be 950 instead of 1,000 shares; that Lazare and Lorraine each owned 250 shares and that Lazare's included the 50 shares in certificate 8; that upon final distribution of both estates the brother and sister should become equals in the ownership of Leon, Inc., each to have 2,500 shares. The net result of such agreement did not alter the respective positions of the brother and sister which would have followed a distribution of the estates according to the actual facts. Pursuant to the agreement the probate court distributed from the estate of Clemence to the estate of Leon 2,275 shares.

From the estate of Leon the entire 4,500 shares were on November 28, 1939, distributed share and share alike to Lorraine and Lazare. Added to the 250 shares each at first had received from Leon, both became owners of 5,000 shares in equal ownership which was thereafter mutually recognized and acknowledged by both of them until the fateful day in January, 1941.

Following the agreement of April 2, 1937, friction between the brother on the one side and his sister and her husband on the other constantly increased. Defendants appear to have been ever alert to find some basis for complaint at Lazare's conduct of the corporation by which they might justify their act in removing him from office and to an inferior position in the division of power. In such quest defendants in 1940 resolved upon the scheme that certificate 8 was void, being an ostensible duplicate transfer of certificates 2 and 3. Upon arriving at that decision, and by means thereof in spite of the agreed basis upon which the two estates had been handled and the hitherto uniform recognition of certificate 8 as a valid certificate, defendants laid plans for utilizing their bold and piratical pretense to remove Lazare from the presidency.

Accordingly, from Boston, Meyberg and Lorraine directed their agents and attorneys, James Meyberg and M. S. Mey-

berg, to give notice of the annual stockholder's meeting for January 15, 1941, at 403 Lane Mortgage Building in Los Angeles. They armed their two agents with proxies to represent them at the stockholder's meeting. The meeting was convened at the time appointed but because there was not a quorum present the meeting was adjourned to January 27, 1941, at the same place. But before adjourning James Meyberg appointed himself as chairman of the annual stockholder's meeting and M. S. Meyberg as "inspector of elections."

On the 24th day of January, plaintiff having learned of the intention of defendants and their agents to allow him to vote only 2,475 shares as against 2,500 owned by defendants, he applied to the superior court and obtained an order, restraining the defendants from interfering with or in any way obstructing plaintiff from voting in person or by proxy 2,500 shares at any meeting of the stockholders of Leon, Inc., pending any increase of the authorized capital and Lazare's ownership of his shares. Process was served with the restraining order and the order to show cause on the day of its issuance, but despite such measures defendants and their agents resolved upon their course to elect themselves as directors willy-nilly. Plaintiff and the proxies of defendants assembled on the 27th pursuant to adjournment of the 15th. While defendants sat in nearby seclusion, they pretended to comply with the letter of the restraining order by instructing their proxies to permit plaintiff to vote his 2,500 shares. So they did. But after the votes had been cast, the "inspector of elections" advised those present that certificate 8 representing 50 shares of plaintiff was void as being a duplicate issue of certificate 6. Upon this startling disclosure the chairman announced that the board elected for the ensuing year consisted of Lorraine and Leonard Meyberg and Lazare Kauffman, each having received 1250 votes and that Pokross, Lazare's nominee, had received only 1,225 votes and was therefore defeated. Thus as a result of such fraudulent acts of defendants and their agents and attorneys, plaintiff was deprived of his equal voting rights for the protection of which he had procured the restraining order.

For their disobedience of the court's order defendants were punished. The judgment of contempt was affirmed in a unanimous opinion of the Supreme Court which reviewed the facts

and held that the conceded ownership of 2,500 shares would not cease at the moment of election of directors.

The proposition that Lazare was not entitled to vote his 2,500 shares because valid certificates had not been issued for that amount is preposterous in view of his conceded ownership of one half interest in the informal, family corporation which was destined from its inception to pass from Leon to his children. The actual owner of shares may exercise his rights without a certificate therefor (*Jean* v. *Jean,* 207 Cal. 115, 121 [277 P. 313]). Moreover, to permit the technical rules as commonly applied to corporations to be applied in the case of a close family corporation of two shareholders of equal ownership, would serve to defeat such equality of ownership, impede justice and perpetuate fraud. (*Hollywood Cleaning & Pressing Co.* v. *Hollywood Laundry Service,* 217 Cal. 124 [17 P.2d 709].) Leon, sole devisee of Clemence, had emphatically bequeathed his property to his two children in equal shares. Meyberg testified that he knew such to have been the intention of Leon. Under such circumstances one could not with reason expect equity to hearken to the miserable defense that plaintiff did not have 2,500 shares of record. Equity looks through form to substance and on beholding the substance will require the corporation to reform its transactions to meet the ends of justice. Mere irregularities in the transactions of a family corporation do not affect their validity. (*Wise Realty Co.* v. *Stewart,* 169 Cal. 176, 185 [146 P. 534]; *Sargent* v. *Palace Cafe Co.,* 175 Cal. 737 [167 P. 146]; *Hunt* v. *Davis,* 135 Cal. 31 [66 P. 957]; *Conover* v. *Smith,* 83 Cal.App. 227 [256 P. 835].) In the light of these authorities it is a dismal wail to chant the technique of corporate practice where the evidence overwhelmingly justifies the finding that Lorraine and Lazare have been the owners in equal shares of Leon, Inc., since the passing of their father in 1935. Seized of such property right neither may be deprived thereof by the wanton trespass of the other so long as the arm of equity may reach the offender. Their mutual rights must be upheld so far as they are ascertainable (*Conover* v. *Smith, supra*).

Aside from the fact that equity may disregard the legalistic veil which appellants have draped about the alleged "election," a glance at the proceedings of that event reveals some aspects that reflect no honor upon certain participants. The

"inspector of elections" was self-constituted and for an especial purpose. The day his appointment was announced only the Meyberg faction was present and that was not a quorum. Its only possible legal action was to adjourn. (*Hexter* v. *Columbia Baking Co.*, 16 Del.Ch. 263 [145 A. 115].) Hence whoever took an office at that meeting usurped it. But the inspector was not satisfied with an office whereby he might prevent an illegal vote. He asserted the privilege of making his challenge in secret and of weighing his own challenge in solitude. When a ballot is questioned at such an election the shareholder presenting the ballot is entitled to be heard. If he be not challenged at the threshold the only remaining duty of those conducting the election is to count the ballots and return the number of votes received by the nominees. After that they have no duty to perform (14a C.J. 57; *Hart* v. *Hardy*, 19 How.Pr. 246, 250). It would be sheer folly to conduct an election by ballot, if the inspector of elections, after ascertaining the victors in the contest, could determine that some of the ballots cast for the successful candidates were illegal and thereby cause the triumph of a minority. (*People ex rel. Harrt* v. *White*, 11 Abb.Pr. 168, 179.)

 (2) Appellants challenge the jurisdiction of the court to enjoin the defendants on the ground that such action is an attempt to determine the ownership of the stock in question. Such jurisdiction they contend was vested solely in the superior court sitting in probate; and inasmuch as the 50 shares in certificate 6 had been awarded by the probate court to the estate of Leon and thereafter from the estate of Leon to Lazare and Lorraine the question of the ownership of those 50 shares was adjudicated by that order. This is specious reasoning. The major premise is a misstatement of the law. Appellants declare that they make no claim to the shares given plaintiff by his father. Since they make no question of plaintiff's gift from Leon that should dispose of their criticism of the finding that plaintiff owned the 2,500 shares. They raise no question of the title of plaintiff to any of his shares except the 50 represented by certificate 8 which the evidence shows and the court found, was a legal gift from Leon. Therefore, no injury could result to appellants from the court's decision.

The jurisdiction of the probate court is not involved. The agreement of plaintiff and defendants to treat both certificates 6 and 8 as representing the same 50 shares, was the result

of Meyberg's misrepresentation that 6 was valid. ▉ By the order distributing all of the shares in equal division to the two heirs the probate court performed its sole function. Although the treatment of the 50 shares as an asset of the estate of Clemence effected the same result exactly as though those shares had never been inventoried in her estate such treatment did not confer upon the probate court jurisdiction to declare Clemence owner of the stock. The probate court has not the power to declare a decedent to be owner of property contrary to fact. The limit of its power is to determine the succession to such title as the decedent had at the time of his decease. It is not its function to determine that he had any title at all. (*Rockey* v. *Vieux*, 179 Cal. 681 [178 P. 712].) ▉ But the claim of jurisdiction of the probate court is far fetched. It did not make any distribution of the 50 shares represented by certificate No. 8, nor did the parties agree that it should do so. Its decree merely distributed the shares of which Leon and Clemence were possessed on the dates respectively of their demises. Since all of the stock of Leon, Inc., was of the same class and concededly had equal voting rights the ownership of one half of it invested plaintiff with power to vote those shares at any election of directors.

But the question of probate jurisdiction was effectually disposed of by the Supreme Court in the case of *Meyberg* v. *Superior Court, supra,* affirming the judgment of the superior court punishing the defendants for disobedience of the restraining order. It was there held that the test of a stockholder's right to vote his shares at a corporate meeting is his ownership of the stock. Such was impliedly a determination that the order distributing the 50 shares in certificate 6 did not affect Lazare's ownership of the 50 shares in 8.

The second challenge to the court's jurisdiction is that the superior court had no power summarily to interfere with the internal affairs of a foreign corporation in doing business in this state. At the opening of the trial defendants moved to quash the service upon the corporation because of its foreign origin. ▉ An action to contest an election of directors under section 315 of the Civil Code, does not aim at obtaining a personal judgment against the corporation. Had it been so the doctrine of *Pennoyer* v. *Neff* (95 U.S. 714 [24 L.Ed. 565]) would now prevail. (*Elberta Oil Co.* v. *Superior Court*, 74 Cal.App. 114, 119 [239 P. 415].) This contest involves the personal rights

in property of individuals domiciled in California. ▆ The action by plaintiff was to prevent the deprivation of his property rights. Courts of equity never hesitate to exercise such jurisdiction when a complainant presents a cause of threatened irreparable injury. ▆ Moreover, after its motion to quash the service had failed the corporations affirmatively invoked the jurisdiction of the court by making a general appearance. (*Remsberg* v. *Hackney Mfg. Co.*, 174 Cal. 799 [164 P. 792].) ▆ Also, the corporation having entered into this state for the purpose of maintaining an office and of transacting part of its business here it thereby impliedly agreed to submit itself to the jurisdiction of our courts according to law. (14a C.J., 1405.) The motion to quash was properly denied.

▆ (3) The contention that the court erred in granting the motion to consolidate the two cases for trial is contrary to statutory provision which commits such a motion to the sound discretion of the trial court (Section 1048, Code of Civil Procedure). The factual recitals of this discussion serve to show that such discretion was not abused.

▆ (4) The claim that plaintiff was without clean hands has likewise been disposed of by the history of the corporation and the conduct of the parties. It is not shown in any discussion in defendants' voluminous briefs that plaintiff was without equity in any respect with reference to the matters presented by either of the actions. The claim that he had taken moneys of the corporation to which he was not entitled is a thing wholly apart from his right to vote his stock at a stockholders' meeting. In order to deny a litigant a hearing because of inequitable conduct the acts complained of must have infected the cause of action and must relate to the transaction concerning which complaint is made. (*City of Los Angeles* v. *Watterson,* 8 Cal.App.2d 331, 340 [48 P.2d 87].) The maxim does not apply to the general morals of plaintiff or to his conduct in other relations. (*Western Union Tel. Co.* v. *Commercial Pac. Cable Co.*, 177 Cal. 577 [171 P. 317].) However, the record contains such evidence as would support the finding that the greater part of the expenditures by Lazare out of corporate funds was in conformity with his policy immediately following the decease of his father and with uses of the same nature as those to which his decedent had applied moneys of the corporation, to wit, the payment

of miscellaneous expenses of Lorraine and other members of the family.

 (5) The rulings upon the admissibility of evidence were without error. The testimony of the witness Sellers was to expose the iniquity of Meyberg who had "cancelled" certificate 6 with his own hand and subsequently denied his act or could not remember it. Schedule G of the federal tax return was admitted over objection and properly so. Both defendants had verified it on April 2, 1937. It contained the statement that Leon, *inter vivos,* had given his two children each 250 shares of Leon, Inc., and that 50 of Lazare's shares were evidenced by certificate 8. One's own past declaration may always be received to impeach his subsequent declaration or testimony. The corporate minutes prepared by Meyberg served the same purpose. The letters that passed between Meyberg and Lazare's counsel in 1937 were proper impeaching evidence. They were proof of the agreement finally reached to treat both certificates 6 and 8 as valid for the purpose of the probate proceedings.

Regarding the bewildering contentions of appellants with the utmost generosity, it would be to scorn the Constitution (art. VI, sec. 4½) to reverse either case in view of the trail left by defendants in their outside maneuverings and at the one annual meeting of the corporation in the six years of Meyberg's struggle for supremacy.

It is ordered that the motion to dismiss the appeals be and it is denied. The judgments are affirmed.

McComb, J., concurred.

A petition for a rehearing was denied August 10, 1943, and appellants' petition for a hearing by the Supreme Court was denied September 15, 1943.