[Civ. No. 18584.   First Dist., Div. One.   June 27, 1960.]

CRANE VALLEY LAND COMPANY (a Corporation), Plaintiff and Appellant, v. BANK OF AMERICA NATIONAL TRUST AND SAVINGS ASSOCIATION (a National Banking Association) as Executor, etc., et al., Respondents; ALEX E. WILSON et al., Defendants and Appellants.

L. W. Wrixon for Plaintiff and Appellant.

Lansburgh, Hoffman & Schiller and George I. Hoffman for Defendants and Appellants.

Eisner & Titchell for Respondents.

DUNIWAY, J.—This is a case in which two brothers of a decedent, both of whom recognized his rights in certain stock of a family corporation throughout his lifetime, seek to deprive his widow of those rights, now that he is dead. Frustrated in their attempt by the judgment below, they now ask us to reverse. The appeals present two questions: (1) whether Crane Valley Land Company can have certain shares of its capital stock declared void because they were issued to the decedent without a permit from the Commissioner of Corporations; and (2) whether those same shares, if validly issued, were held by the deceased record owner, as to two-thirds thereof, as trustee for his two brothers. We answer both questions in the negative and conclude that the judgment must be affirmed.

Crane Valley Land Company ("Crane Valley") plaintiff below, and one of the appellants here, is a California corporation, organized in 1946 for the purpose of owning certain timber land in Butte County. At that time, 100 shares of its capital stock were validly issued, for cash, pursuant to a permit of the Commissioner of Corporations. Twenty-five shares were issued to each of the following: Ward Cox, Ben C. Koepke, Clarence Williams and Alex Wilson ("Alex"). Thereafter Alex gave 12½ of his shares to his brother William Wilson ("William"). Alex and William are cross-complainants below and the other appellants here. Clarence Williams gave 12½ of his shares to Arthur Wilson ("Arthur"), a brother of Alex and William. In 1950, the company purchased for cash and retired the 25 shares owned by Koepke. The purchase of the Koepke stock was made pursuant to resolutions properly adopted and recorded in the minutes, was recorded in the stock records of the corporation, and was made

with its funds. From that time until the transaction here in question the stock was owned as follows:

| | | |
|---|---|---|
| Ward Cox | 25 | shares |
| Alex | 12½ | ,, |
| William | 12½ | ,, |
| Arthur | 12½ | ,, |
| Clarence Williams | 12½ | ,, |
| Total | 75 | shares |

During the summer of 1951, it was apparent to the three Wilson brothers that there was considerable valuable timber on the land owned by the company and they were anxious to buy Cox out at a low figure without letting him know the company's prospects. Arthur, who is now deceased and whose interests in this action are represented by respondent Bank of America National Trust and Savings Association as executor of his will, was then in Europe. Alex was the active member of the family so far as Crane Valley was concerned, William being a school superintendent who left the conduct of the company's affairs to Alex. Cox finally indicated that he was willing to sell his stock for $3,500 and, as the court found, Arthur purchased the stock for $3,500 cash. The certificate, standing in his name, was found in his safe deposit box after his death, which occurred on August 11, 1956.

This action was instituted by Crane Valley to have it determined that these 25 shares were void on the theory that they were sold by Cox to Crane Valley, thereby becoming treasury shares, and were then reissued to Arthur without a permit from the Commissioner of Corporations. The defendants in the action, in addition to the executor, are his widow, Ellen, the other respondent, and the two brothers, Alex and William. The complaint was verified by Alex and the action was filed pursuant to a resolution adopted at a meeting at which only Alex and William, holding of record 12½ shares each, or one-third of the total stock then outstanding of record, were present.

Alex and William cross-complained. In their cross-complaint they claim that the stock was not purchased by Crane Valley but by Arthur, that this was done with the understanding that Arthur was making the purchase on behalf of the three brothers and that he would thereafter transfer to each of them one-third of the 25 shares purchased. They claim that it was part of the understanding that they were each to reimburse him for one-third of the purchase price that he had

paid. The cross-complaint was also verified by Alex, and obviously one or the other of his two verifications was false. (*Cf. Faulkner* v. *California Toll Bridge Authority,* 40 Cal.2d 317, 328 [253 P.2d 659].)

The court found, in substance, that Crane Valley did not purchase the shares but that Arthur did purchase them with his own money and for his own account, and that the brothers deliberately led Cox to believe that he was selling to Crane Valley, and thereby caused him to endorse his certificate to Crane Valley. The evidence shows that this was done because the brothers believed that if Cox thought that Arthur were buying, Cox would not go through with the deal, as he did not like or trust Arthur. The evidence also indicates that the brothers were just as anxious to freeze out Williams as they were to get rid of Cox and that this was another reason why Arthur rather than the corporation bought the shares. If the corporation bought the shares, Williams, as one of the shareholders, would benefit by the reduction by one-third in the number of shares outstanding, whereas he would not benefit if Arthur bought the shares. The maneuver was successful, at least to the extent that thereafter Williams sold to Arthur his $12\frac{1}{2}$ shares. Thus, at the time of Arthur's death, Arthur owned 50 shares and Alex and William each owned $12\frac{1}{2}$, their interests being, respectively, two-thirds, one-sixth and one-sixth.

The court also found that the only persons who would benefit if Crane Valley were successful in having the 25 shares declared void would be Alex and William, as they would then each own one-fourth of the shares instead of one-sixth, whereas Arthur's widow would then own one-half of the shares instead of two-thirds. The court also found, in response to the cross-complaint of Alex and William, that it is not true that Arthur purchased the shares under an agreement whereby Arthur advanced the purchase price of the stock but each of the brothers would own a one-third interest therein, or whereby Alex and William were indebted to Arthur for one-third of the purchase price, or whereby Arthur would hold the stock in his name as trustee for the benefit of all three brothers. The court found that Arthur purchased the stock for himself alone and that there was no agreement or trust of any character and that neither Alex nor William ever acquired or held or has any interest in the 25 shares in question.

We consider separately the appeal of Crane Valley and the appeal of Alex and William.

## 1. *The Shares Are Valid.*

There is abundant evidence in the record supporting the court's finding that Arthur, not Crane Valley, purchased the shares. Crane Valley asserts that the facts are undisputed and that the only question is one of law. This is scarcely an accurate characterization of the record. For example, Alex testified that on or about August 6, 1951, there was a meeting of the directors at which a resolution was adopted providing for the purchase of the shares by Crane Valley for $3,500, to be borrowed from Arthur. The minutes of the corporation were produced and there are no minutes of any such meeting nor does such a resolution appear anywhere in the minutes. The Koepke transaction shows that the corporation knew how to buy stock when it wished to do so. The record is replete with written evidence, including letters signed by Alex, and others signed by Arthur, in which it is stated, in substance, that Arthur purchased the shares but that Alex caused the transfer to be cast in the form, so far as Cox was concerned, of a purchase by the corporation, for the purpose of deceiving Cox. The evidence that Arthur paid the money is uncontradicted. It is also uncontradicted that none of the money ever went into the account of Crane Valley, that no entry was ever made on the books or in any other record of Crane Valley showing that it was indebted to Arthur for his $3,500 that was paid to Cox, and that no instrument in writing, either in the form of a promissory note or in any other form was ever delivered to Arthur by or on behalf of Crane Valley to evidence the supposed debt. Alex, who was thoroughly impeached in his cross-examination by counsel for the executor, took refuge in a claim that the Crane Valley "debt" to Arthur was paid by the issuance to Arthur of the certificate for the 25 shares that his money had paid for. There is nothing whatever in the records of the corporation that supports this testimony.

Crane Valley is driven to the contention that the purchase was by it as a matter of law because Cox's instructions to the escrow holder spoke of a sale by him to Crane Valley and because his certificate was endorsed by him to Crane Valley. The record further shows, however, that on August 25, 1951, Cox's certificate, which had been received from the escrow holder, was cancelled by Williams, who was the secre-

172

tary of the corporation, with the following notation: "Cancelled August 25, 1951, Clarence B. Williams, Secretary." Alex was present, and at the same time a new certificate for the same number of shares was issued in the name of Arthur R. Wilson. A notation was made by Williams on the stub of the Cox certificate, Number 1, reading as follows: "Cancelled certificate 1 8-25-51. Certificate 1-A issued to Arthur R. Wilson August 25, 1951." A receipt was given for the new certificate Number 1-A signed "Arthur R. Wilson, by Alex E. Wilson, Agent." The new certificate was signed by Alex as president. The record shows that at the time of the purchase the corporation had $10 in its bank account, and had a net deficit of $456.73. Under these circumstances a purchase by the corporation of its own shares would have been illegal. (Corp. Code, §§ 1705, 1706, 1707, and 1708.) The record also shows, and the court found, that from the time that certificate Number 1-A was issued to Arthur and delivered to Alex as his agent (and later by Alex to Arthur), until Arthur's death, all of the business of the corporation, including the payment of two substantial dividends, was conducted on the basis that Arthur owned the shares. Alex himself testified that Arthur purchased the shares, although he attempted to qualify this testimony. The court was not bound to accept this qualification. Indeed, in weighing the testimony, the court could consider the fact that Arthur's testimony was no longer to be had, as he was dead. (*Austin* v. *Wilcoxson*, 149 Cal. 24 [84 P. 417].)

We are therefore brought to the single question whether the facts, as found by the court, that Cox was led by the other stockholders of Crane Valley, all acting together, into believing that Crane Valley was purchasing the shares and that Cox endorsed his certificate to Crane Valley, are sufficient to compel the conclusion that when the certificate was delivered to the secretary of Crane Valley for cancellation and reissue of the shares to Arthur, the shares were as a matter of law purchased by Crane Valley, thereby becoming treasury shares (Corp. Code, § 116), so that the new certificate issued to Arthur was a reissue of these treasury shares without a permit required by the Corporations Code (§ 26100). We have no difficulty in answering this question. The corporation acquired no title to the shares; it was a mere conduit; and if, by reason of the endorsement, it could be said to have acquired any title, the title acquired was that of an agent for an undisclosed principal, or of a trustee of a dry legal title, for Arthur,

who had purchased the shares. Moreover, the corporation has no standing to question the validity of the shares. Nor do the brothers Alex and William, who, in their own cross-complaint assert the validity of the shares and claim an interest in themselves; this is blowing hot and cold with a vengeance.

One can be a shareholder of a corporation, even though no certificate at all has been issued (*Meyer & Holler* v. *Ramona Village*, 5 Cal.App.2d 679 [43 P.2d 823, 44 P.2d 634]; *cf. Young* v. *New Pedrara Onyx Co.*, 48 Cal.App. 1, 14 [192 P. 55]). Here a certificate in due form was issued and delivered to Arthur. This is in itself evidence that the shares were validly issued, especially when the certificate had been outstanding for five years, as in this case. (*Kauffman* v. *Meyberg*, 59 Cal.App.2d 730, 734 [140 P.2d 210]; Corp. Code, § 833.) The fact that the Cox certificate was not endorsed or assigned in writing by Crane Valley to Arthur is of no moment. Particularly in the case of small, family controlled corporations like Crane Valley, courts look at the substance of the transaction, and disregard mere irregularities in paper work. (*Kauffman* v. *Meyberg, supra,* 59 Cal.App.2d 730, 739; *Wise Realty Co.* v. *Stewart*, 169 Cal. 176, 185 [146 P. 534]. *Cf. Young* v. *New Pedrara Onyx Co., supra,* 48 Cal.App. 1, 14-15.) Under the circumstances of this case, Crane Valley's reliance on the Uniform Stock Transfer Act (Corp. Code, §§ 2453, 2461, 2462) is misplaced. No bona fide purchaser is involved; the question is solely as to the rights of the original parties to the deal. Arthur having paid for the stock, Crane Valley, if it acquired any interest in the stock by the assignment, was a trustee for Arthur under a resulting trust. (*Bituminized Brick & Tile Co.* v. *Simons Brick Co.*, 183 Cal. 687, 693 [192 P. 528]; *Schwarting* v. *Artel*, 40 Cal.App.2d 433, 441 [105 P.2d 380].)

In *Davies* v. *Acware Plastics*, 116 Cal.App.2d 798 [254 P.2d 663], the facts were very similar. The buyer thought he was buying stock from the corporation, but in fact bought from one of the stockholders. The buyer's check was payable to the corporation, and the selling stockholder authorized its payment to the corporation as a loan. It was held that no permit was required, the sale being within Corporations Code, section 25152, clause (a). The same is true here. *Castle* v. *Acme Ice Cream Co.*, 101 Cal.App.94 [281 P. 396], heavily relied upon by Crane Valley, is clearly not in point. There, the court below found, upon sufficient evidence, that the corporation acquired the stock from shareholder A and then reissued it

to stockholder B. Under those circumstances, a permit was required, and B could sue to recover the consideration he gave. Here the court found, and upon sufficient evidence, that the transaction was a purchase from Cox by Arthur, not by Crane Valley, and involved no issuance of stock by Crane Valley.

■ Moreover, even if a permit were required, Crane Valley would be in no position to assert that the stock is void. The Corporate Securities Act was intended to protect those to whom a corporation issues and sells its securities. It would be a perversion of the act to permit the corporation to take advantage of its own wrong, particularly where, as here, the venture has proved successful. All of the cases agree upon this proposition. (See, for example, *Eberhard* v. *Pacific Southwest L. & M. Corp.*, 215 Cal. 226 [9 P.2d 302] ; *Security-First National Bank* v. *J. G. Ruddle Properties, Inc.*, 218 Cal. 435 [23 P.2d 1016] ; *Domestic & Foreign Petr. Co., Ltd.* v. *Long*, 4 Cal.2d 547, 558-559 [51 P.2d 73].) "No one can take advantage of his own wrong." (Civ. Code, § 3517.)

Since the stock is valid, Crane Valley has no right to recover from Arthur's estate the dividends that he received.

We turn to the appeal of Alex and William.

2. *Arthur was not a trustee.*

The brothers' appeal is totally without merit. The court found against their claims; the question was one of fact; the evidence was conflicting and that portion favorable to respondents fully supports the judgment. That is the end of the matter.

■ Their cross-complaint alleged an express agreement by Arthur to buy the stock one-third for himself and one-third for each of them. They now rely, not on such an agreement but on promissory estoppel, on a constructive trust based upon Arthur's alleged promise, and on a "resulting trust." Of course, they had the burden of proof. (*Holland* v. *Bank of Italy Nat. Trust & Sav. Assn.*, 115 Cal.App. 472, 483-484 [1 P.2d 1031].) It is enough to say that their behavior, for five years after Arthur's purchase and until after his death, was totally inconsistent with their present claims. There is evidence that Arthur intended at one time to make a gift to them, that he received no consideration whatever for his alleged promise, and that the brothers later told him to abandon the idea because he had bought and paid for the stock and it was his. They consistently and repeatedly recognized him as owner, caused the corporation to pay him dividends, never

offered to pay him for the shares they now claim, never asked him for the shares, signed papers stating that he owned them, etc. Arthur, too, treated the shares as his throughout, and his brothers never protested. One cannot help suspecting that if Arthur ever really intended to give them any of the shares, he decided not to do so for the sake of his widow. His wisdom in so doing is demonstrated by the activities of his brothers now that he is gone. Their conduct is another example of the strange cupidity that infects people whenever a dead man's property is involved.

Under the facts as found by the court there was no promissory estoppel—not a promise, but only an expression of intent to give; no reliance thereon to the detriment of anyone; no injustice. The brothers want something for nothing—although they now generously offer to pay the widow one-third each of $3,500. (*Cf. Bard* v. *Kent,* 19 Cal.2d 449, 453 [122 P.2d 8, 139 A.L.R. 1032].) The cases they cite (*Hunter* v. *Sparling,* 87 Cal.App.2d 711 [197 P.2d 807]; *Wade* v. *Markwell & Co.,* 118 Cal.App.2d 410 [258 P.2d 497, 37 A.L.R.2d 1363]) are thus not in point.

There was no constructive trust. Such a trust was not pleaded. (*Lezinsky* v. *Mason Malt Whiskey Distilling Co.,* 185 Cal. 240, 243-244 [196 P. 884].) It was not proved. No confidential relationship was shown, and the finding that there was no trust is an implied finding that no such relationship existed. Its existence is a matter of fact (*Steinberger* v. *Steinberger,* 60 Cal.App.2d 116, 122 [140 P.2d 31]). No fraud or breach of fiduciary duty was alleged, proved, or found. The findings are, by implication, against it. Neither Alex nor William ever had any interest in or claim to the stock. How, then, could Arthur become a constructive trustee of it for them, by buying it from Cox? If anyone was deceived, misled, or imposed upon, it was not Alex or William, but Cox. An ineffectual attempt to make a gift does not create a trust. (*Bishop's School* v. *Wells,* 19 Cal.App.2d 141, 148 [65 P.2d 105]; *cf. Blonde* v. *Estate of Jenkins,* 131 Cal.App.2d 682, 685 [281 P.2d 14].)

Obviously there was no resulting trust for Alex and William. They paid none of the consideration. (Civ. Code, § 853; *Roberts* v. *Ware,* 40 Cal. 634, 636-637; *Lincoln* v. *Chamberlain,* 61 Cal.App. 399 [214 P. 1013].)

In short, there was no trust at all.

Affirmed.

Bray, P. J., and Tobriner, J., concurred.