Fred J. TABERY and Leone M. Tabery,
Petitioners on Review,

v.

COMMISSIONER OF INTERNAL REVENUE, Respondent on Review.

No. 19721.

United States Court of Appeals
Ninth Circuit.

Dec. 17, 1965.

Glenn S. Roberts, Ralph H. Moore, Earl C. Crouter, Los Angeles, Cal., for petitioners.

Louis F. Oberdorfer, Asst. Atty. Gen., Lee A. Jackson, Melva M. Graney, Norman H. Wolfe, Attys. Dept. of Justice, Washington, D. C., for respondent.

Before BARNES, HAMLIN and ELY, Circuit Judges.

ELY, Circuit Judge:

Before us is a petition for review of a Tax Court decision holding that the petitioners were deficient in the payment of their joint income tax for the year 1960. The opinion by Judge Fay of the Tax Court is found at 23 CCH Tax Ct. Mem. 1108, P–H Tax Ct. Mem. 64,189 (1964).

The issues are (1) whether the Tabery Corporation [hereinafter called Tabery] redeemed, within the meaning of § 317 (b) of the Internal Revenue Code of 1954,[1] eighty shares of its stock from petitioners Fred J. Tabery and Leone M. Tabery [hereinafter called taxpayer] on July 31, 1960, and (2) if so, whether or not the distribution made by Tabery was essentially equivalent to a dividend, i. e., whether the distribution is to be treated as a capital exchange under §.302[2] or as a dividend under § 301. The facts, as stipulated by the parties and as found by the Tax Court, are as follows:

Taxpayer is the sole shareholder of Tabery, a California corporation principally engaged in the business of the decoration, operation, and promotion of trade association shows and the construction of street and building displays throughout the United States. Tabery maintains books by the accrual method with a fiscal year ending July 31st. The taxpayer employs a cash calendar-year method.

---

1. "For purposes of this part, stock shall be treated as redeemed by a corporation if the corporation acquires its stock from a shareholder in exchange for property, whether or not the stock so acquired is cancelled, retired, or held as treasury stock." Int.Rev.Code of 1954, § 317(b).

All statute references herein are to the Internal Revenue Code of 1954, except as otherwise specified.

2. "(a) If a corporation redeems its stock (within the meaning of section 317(b)), and if paragraph (1), * * * applies, such redemption shall be treated as a distribution in part or full payment in exchange for the stock.

"(b) (1) Subsection (a) shall apply if the redemption is not essentially equivalent to a dividend." Int.Rev.Code of 1954, § 302(a), (b) (1).

On July 31, 1933, taxpayer acquired 124 shares of stock in Menard Decorators, Inc. On Januuary 26, 1944, he acquired another 124 shares of Menard stock, and later in the same year, he acquired the remaining two shares of the 250 authorized, issued, and outstanding stock of Menard. The corporate name was changed to Tabery, but the share certificates were not exchanged and continue to show the name of the corporation as Menard. Since 1944, taxpayer has been the president and sole shareholder of Tabery.

Other officers of the company during the relevant period included John W. Christopher, Secretary, and Louis M. Goodholme, Treasurer. Christopher acted as office manager, purchasing agent, and accountant. He was responsible for keeping Tabery's books and for the preparation of tax returns. Goodholme worked with Christopher in maintaining the books and records and has also been responsible for all tax matters of the corporation since his employment in 1933. During the year 1960, the board of directors of Tabery consisted of taxpayer, Christopher, and Goodholme.

In 1957 taxpayer decided to remodel, renovate, and air-condition the Plan Room Building, a five story commercial structure owned by taxpayer individually from 1946 to and through 1960. The building was physically located some 25 blocks from the Tabery offices and was rented by taxpayer to commercial tenants.

Inasmuch as Tabery was a licensed contractor, maintaining a permanent work force of carpenters, designers, and painters, taxpayer decided that Tabery should perform the major portion of the renovating work. Tabery completed the work by March 1, 1960, charging taxpayer $201,025.16 therefor. The account was carried on Tabery's books as "Job Account Receivable," and by March 31, 1960, the balance had been reduced to $116,025.16 through credits to the account in the amount of $85,000, including a cash payment by taxpayer of $50,-000.

Quoting from the Tax Court's recitation of the facts:

"Tabery possessed a corporate minute book. However, no entries were made in this book since 1945. The board of directors of Tabery met at least once a year. The meetings were very informal and usually just consisted of a round-table discussion in [taxpayer's] office. There was no advance notice given of the meetings. Notes were rarely taken at any of the meetings.

"Sometime after March 1, 1960, but before July 1, 1960, [taxpayer], John, and Louis discussed the ways in which [taxpayer] could repay his indebtedness to Tabery. One suggestion was that [taxpayer] borrow the money from an outside source. Another suggestion made by John and Louis was that [taxpayer] transfer some of his shares of Tabery stock to Tabery. The number of shares would depend upon the value of the stock as of the time of transfer. Louis determined the book value of one share of Tabery stock to be worth $1,400. This value was arrived at by taking into account the cash in banks, accounts receivable, and inventories. This was accepted by the [taxpayer] and John, and it was agreed that [taxpayer] would transfer 80 shares of stock to Tabery in return for the cancellation of his indebtedness to the extent of $112,000. [Taxpayer] wanted legal advice regarding this proposed sale. John and Louis contacted an attorney who had performed legal services for Tabery in the past regarding the proposed sale. After contacting the attorney, John and Louis again discussed the matter with [taxpayer], who agreed to transfer his stock to Tabery. To record the transfer, the following journal entries on the

books of Tabery were made on July 31, 1960, by John with the approval of the board of directors, including [taxpayer]:

"(1) Debit: Tabery Drawing Account $116,025.16

 Credit: (Job) Accounts Receivable $116,025.16
 To transfer from Accounts Receivable to Tabery Drawing, Invoice No. 9191 at 3/1/60 in the amount of $73,025.16 and balance at 7/31/58 of $43,000—Plant Room Building

(2) Debit: Treasury stock $112,000.00

 Credit: Tabery Drawing Account $112,000.00
 To record the purchase from [taxpayer] of 80 shares at $1,400.00 stock Tabery Corporation, value $1,400.00 per Board meeting dated 7/11/60.

"John prepared the income tax return of Tabery for the year ended July 31, 1960. One of the assets on the balance sheet of Tabery was treasury stock in the amount of $112,000. The return was prepared with the approval of Louis. John helped in the preparation of [taxpayer's] income tax return for the calendar year 1960. The transaction regarding the 80 shares of Tabery's stock was reflected on [taxpayer's] return as a long-term capital gain. [Taxpayer] was aware of the fact that his return reflected the transfer of stock to Tabery. Both [taxpayer] and Tabery were of the impression that a transfer of stock had taken place as of July 31, 1960, which impression was consistent with their intentions.

"[Taxpayer] left his shares of stock in Tabery in a vault located on the premises of Tabery. The 80 shares of stock transferred by [taxpayer] to Tabery were not physically delivered to Tabery. [Taxpayer] would have physically delivered the stock certificates to Tabery if he believed this was necessary to complete the transaction.

"Sometime in February 1961 a revenue agent began an investigation of Tabery's return. Inquiries were made regarding [taxpayer's] income tax return for the year 1960. In May 1961 after [taxpayer] filed his 1960 return, he was informed by the examining agent that the transfer of stock to Tabery in return for the cancellation of his indebtedness would be considered a dividend taxable at ordinary income rates. [Taxpayer] had hoped that the transfer of stock would result in a capital gain so that he could pay off his indebtedness to Tabery at the least cost to him. In view of the Revenue agent's position regarding the transaction, Tabery, as of July 31, 1961, had two journal entries recorded on its books reversing the two entries made on July 31, 1960, with the following explanation: 'To reverse July 31, 1960 journal entry 268 made in error.'

"After the receipt by [taxpayer] of a 10- and a 30-day letter from the Commissioner, he filed an amended return for the year 1960. The amended return was identical in all respects with the original except that the transfer of stock to Tabery was omitted. Tabery also filed an amended return for its fiscal year ended July 31, 1960, to reflect the

second set of journal entries. Both the [taxpayer's] and Tabery's amended returns were filed March 9, 1962.

"Sometime in June 1961 [taxpayer] discussed with certain key employees the possibility of their purchasing stock in Tabery. These discussions took place eleven months after [taxpayer] had transferred 80 shares of stock to Tabery. Nothing ever came of those discussions.

"Tabery has declared and paid dividends to [taxpayer] for the fiscal years ended July 31, 1955, through and including July 31, 1961, of $15.-000 per annum.

"The accumulated earned surplus of Tabery as of July 31, 1960, was $183,796.31."

 It is in the light of the foregoing facts that we consider the issues presented in this appeal. First, did Tabery redeem the eighty shares? The Tax Court determined that Tabery acquired eighty shares of its stock from taxpayer. In reaching its conclusion, it properly applied the rule that whether a sale of stock is consummated depends upon all the facts and circumstances, including the intent of the parties. Thal v. Commissioner of Internal Revenue, 142 F.2d 874 (6th Cir. 1944); Bank of America Nat. Trust & Sav. Ass'n, 15 T.C. 544, (1950), aff'd per curiam, 193 F.2d 178 (9th Cir. 1951). It listed the controlling facts and circumstances which brought it to its determination.[3] We believe that the taxpayer has not sustained the burden which he bears in our court, i. e., demonstrating that the Tax Court's finding was clearly erroneous. Peurifoy v. Commissioner of Internal Revenue, 358 U.S. 59, 79 S.Ct. 104, 3 L.Ed.2d 30 (1958); Truck Terminals, Inc. v. Commissioner of Internal Revenue, 314 F.2d 449 (9th Cir. 1963); Young v. Commissioner of Internal Revenue, 268 F.2d 245 (9th Cir. 1959).

 The taxpayer vigorously contends that his failure to transfer the corporate shares in compliance with the formalities of California law precludes a finding that the shares had been redeemed.[4] Under some circumstances title to shares of stock may pass in California without actual delivery of the certificates. Robbins v. Pacific Eastern Corp., 8 Cal.2d 241, 65 P.2d 42 (1937). Here, where the certificates were on the premises of the redeeming corporation, where the corporation and its sole shareholder had a history of rather casual handling of the corporate rec-

---

3. "[Taxpayer] intended to sell his stock in Tabery to the latter. As a member of the board of directors of Tabery, he discussed the proposed sale and purchase with the other members of the board on several separate occasions. The advice of an attorney was solicited regarding the sale. An evaluation was made of the book value of the shares of stock. Journal entries regarding the sale were made with the approval of the entire board of directors, including [taxpayer]. The corporate income tax return was prepared and filed recording the purchase of stock. [Taxpayer's] individual income tax return was filed reporting the sale as long-term capital gain. This was done with [taxpayer's] knowledge and full consent. Cf. Jacob M. Kaplan, 21 T.C. 134 (1953). [Taxpayer's] return was filed in April 1961, almost nine months after the sale took place and at a time when he felt a completed sale had taken place. Everyone involved treated the sale as a completed trans-

action until a revenue agent began to audit both the corporate and individual returns. Then and only then did a question arise as to the validity of the sale. Quickly thereafter the journal entries were reversed and amended returns filed."

4. We are not certain that the California statute regarding the transfer of corporate shares requires the same formalities in stock redemption situations. See Cal. Corp.Code §§ 1700–1716, especially § 1706(a): "A corporation may purchase, out of stated capital or out of any surplus, shares issued by it, or by a corporation of which it is subsidiary, in any of the following cases: (a) To collect or compromise in good faith a debt, claim, or controversy with any shareholder."

We are proceeding on the theory, however, that even if formal requirements are applicable to redemptions, such was not necessary for the parties to effect the transfer in this case.

ords, and where the consideration for such shares, the cancellation of the debt, was entered on the corporation's books, we agree with the Tax Court's conclusion that title passed and that the consideration flowing to taxpayer was the cancellation of $112,000 of his debt to Tabery. Mere irregularities in a transaction affecting a family or closely held corporation do not affect the validity of the transaction. Kauffman v. Meyberg, 59 Cal.App.2d 730, 739, 140 P.2d 210 (1943). Surely the same rule should apply in sole shareholder situations. The Tax Court, to see the true substance of the transaction, properly disregarded mere irregularities in paper work. See Crane Valley Co. v. Bank of America Nat. Trust & Sav. Ass'n, 182 Cal.App.2d 166, 173, 5 Cal. Rptr. 731 (1960). Furthermore, taxpayer cannot be permitted to make of his own failure to comply with state law an avenue for the avoidance of the effect of federal taxing statutes. Lodi Iron Works, Inc., 29 T.C. 696 (1958); see also London v. Ansen Holding Co., 206 Cal.App.2d 392, 23 Cal.Rptr. 747 (1962); Crane Valley Land Co. v. Bank of America Nat. Trust & Sav. Ass'n, supra.

Second, was the distribution essentially equivalent to a dividend? The Tax Court held that it was.

█ Our court regards "determinations as to whether a certain transaction is essentially equivalent to a dividend as a mixed question of law and fact, if not purely a conclusion of law." Kerr v. Commissioner of Internal Revenue, 326 F.2d 225, 229 (9th Cir.), cert. denied, 377 U.S. 963, 84 S.Ct. 1644, 12 L.Ed.2d 735 (1964). Thus, as to the ultimate question of dividend equivalence, our scope of review is broader than that limited by the clearly erroneous test. The underlying factual determinations of the Tax Court are, of course, put to that test.

In resolving the question of essential equivalence to a dividend, all circuits apply the "net effects" test, although there are different opinions as to the form which the test shall take. See Comment, The Dividend-Equivalence Test: Forty Years of Confusion, 43 Texas L. Rev. 755 (1963). Our court, in applying what may be called the "flexible net effects test," takes into consideration all of the factors relevant to the distribution. "The final criterion, *and by far the most important*, is the net effect of the transaction: the result." Kerr v. Commissioner, supra, at 235. (Emphasis in original.)

In this case the taxpayer contends that Tabery had a valid business purpose in acquiring the shares and that the existence of such purpose prevents the conclusion that the cancellation of the $112,000 debt was essentially equivalent to a dividend. The alleged business purpose was the corporation's acquisition of the shares in order to make them available for an employee stock-purchase plan. Regarding this purpose the Tax Court wrote,

"Tabery redeemed its stock from petitioner on or before July 31, 1960. Any discussion of a proposed stock purchase plan for employees did not materialize until June 1961, almost eleven months after the redemption and one month after respondent began his examination of [taxpayer's] 1960 income tax return. * * * Clearly the facts of this case do not indicate that the stock was redeemed to enable certain key employees to become shareholders, * * *."

In certain cases a corporation's redemption of shares for availability to its key employees may be a valid business purpose of such a nature as to bring the transaction within the provisions of § 302. See Kerr v. Commissioner, supra at 234–235. We are not convinced, however, that the circumstances of this transaction are such as to entitle the taxpayer to the benefits of the section.

█ As the Tax Court found, "the real, if not the only purpose behind the redemption was a shareholder purpose, i. e., the reduction of [taxpayer's] indebtedness to Tabery." Following the redemption, taxpayer remained the sole shareholder of all the outstanding shares of Tabery. All that had really changed

was that he no longer owed Tabery the full amount of the debt. The "net effect" was the same as if Tabery had distributed a cash dividend and taxpayer had used the funds to reduce his obligation. The purpose of the transaction was essentially a shareholder purpose, not a corporate purpose. It is not entitled to favored capital gain treatment. See Earle v. Woodlaw, 245 F.2d 119 (9th Cir.), cert. denied, 354 U.S. 942, 77 S.Ct. 1400, 1 L.Ed.2d 1537 (1957).[5]

Affirmed.

5. Earle v. Woodlaw involved payments made to taxpayer and cancellation of indebtness owed by taxpayer to the corporation in return for taxpayer, the sole shareholder, selling the corporation one half of the outstanding stock. Emphasizing the absence of a legitimate business purpose "of the corporation, and not of [the taxpayer] personally," 245 F.2d at 122 (Emphasis supplied), the court held the distribution essentially equivalent to a dividend under § 115(g) of the Internal Revenue Code of 1939. In Kerr v. Commissioner of Internal Revenue, 326 F.2d 225 (9th Cir.), cert. denied, 377 U.S. 963, 84 S.Ct. 1644, 12 L.Ed.2d 735 (1964), a case under the 1954 code, this court cited Earle with approval. The language of § 302(b) (1) comes from § 115(g) of the 1939 Code. It was not intended that the language be given an expanded meaning in the 1954 Code. See Bittker, The Taxation of Stock Redemptions and Partial Liquidations, 44 Cornell L.Q. 299, 301–02, 322–25 (1959).